## HOUSTON, E. & W. T. RY. CO. v. BARRON.
### (No. 706.)

(Court of Civil Appeals of Texas. Beaumont. July 2, 1921. Rehearing Denied Nov. 23, 1921. Dissenting Opinion Nov. 30, 1921.)

1. **Railroads** ⊜⟶383(1)—**Pedestrian held guilty of contributory negligence.**

A pedestrian using a familiar passway in a railroad yard who did not look before crossing a switch track and was struck by cars making a flying switch, *held* guilty of contributory negligence barring recovery, though statutory signals were not given.

2. **Negligence** ⊜⟶83—**Doctrine of discovered peril stated.**

To recover under the doctrine of discovered peril, it must be made to appear by evidence that the injured person was in a position of imminent danger, and that the defendant, or some one acting for him, actually discovered the peril in time to have averted the injury by the exercise of ordinary care in using all reasonable means at hand.

3. **Railroads** ⊜⟶400(14)—**Evidence held not to raise issue of discovered peril.**

In an action for injuries received on switch track in yard when a flying switch was made, evidence *held* not to raise the issue of discovered peril.

Walker, J., dissenting.

Appeal from District Court, Nacogdoches County; Lee D. Quinn, Judge.

Suit by I. D. Barron against the Houston East & West Texas Railway Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Garrison, Pollard, Morris & Berry, of Houston, for appellant.

Woods, King & John, of Houston, for appellee.

HIGHTOWER, C. J. This was a suit by the appellee, Barron, against appellant to recover damages for personal injuries sustained by appellee on March 31, 1920. The trial below was with a jury, whose verdict consisted of answers to special issues, and was in favor of appellee for $10,538.60. Appellee was struck by one of appellant's cars in its yards at Nacogdoches, Tex., during a switching operation of the train, and his left leg was so injured that it became necessary to amputate it several inches below the knee. After its motion for new trial had been overruled, appellant duly prosecuted its appeal to this court.

We find in appellee's brief the following statement of the case, which statement shows the material allegations of appellee's petition, as follows:

"Paragraph 2. That on or about the 31st day of March, A. D. 1920, plaintiff resided in the said city of Nacogdoches, about a half mile south of the yards of the defendant, and at about 7:30 o'clock a. m., on the said 31st day of March, 1920, he was proceeding from his home to the office of the American Railway Express, where plaintiff was employed, the said office being situated in the yards of the defendant in said city of Nacogdoches; that, in going from his home to the said office, plaintiff followed a well-beaten pathway or cinder walk along the defendant's main line track, which said pathway was then and there customarily used by the public as a passway for pedestrians, and has been so used by the public generally for a number of years, all of which was well known to. the defendant, its servants, agents, and employés, and the use of said pathway and cinder walk for pedestrians, as aforesaid, has been and was then and there acquiesced in and consented to by the defendant; that especially did defendant acquiesce and consent to the use of the pathway and cinder walk by plaintiff and other employés of the American Railway Express, the said office of the said express company being situated on defendant's right of way and premises,. and the defendant then and there consenting and acquiescing in the use of the said pathway by plaintiff and other employés of the said express company for gaining ingress and egress from and to said express company office, and the defendant and its agents and servants then and there well knowing that it was and had been the custom of plaintiff and other employés of the said express company, for a long time previous thereto, to pass over and through said railway yards upon said pathway or cinder walk in going to and from their work at said express office; that as plaintiff crossed Cox street in the said city of Nacogdoches, near the south margin of the yards of the defendant, going in a northerly direction towards defendant's depot and in the direction of plaintiff's place of work, a freight train of defendant was being pulled out across said Cox street, and a brakeman in the employ of the defendant was then and there stationed at a switch stand near the margin of said street for the purpose of switching cars out of said freight train and placing them on the tracks in defendant's yards; that plaintiff passed within a few feet of the said brakeman, speaking to him as he passed, and proceeded in a northerly. direction along said main line track, following said, beaten pathway, in the direction of his place of work, and in plain view of the said brakeman and other employés of the defendant, who were then and there engaged in switching said cars; that after plaintiff had passed the aforesaid switch stand the agents, servants, and employés of the defendant carelessly and negligently made a double flying or kicking switch across said Cox street, as a result of which some of the cars in said train were kicked onto a track to the north or west of the main line track, and to plaintiff's left, which said cars plaintiff then and there observed; that plaintiff at the time he observed said cars that had been kicked onto said switch track to his left and to the north of the main line track was bearing to his right and across the switch line track, near to a certain other switch track located south of the main

⊜⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

line track, and was proceeding in a northerly direction along said cinder pathway near the latter switch track and in the direction of the office of the express company, and also in the direction of the office of the yardmaster of defendant, which was located in said yards, and at which office plaintiff was to deliver a pail of milk, which he was then and there carrying to an employé of defendant; that it had been the custom of plaintiff for some time previous to said date to make delivery of a pail of milk at said office to an employé of defendant each morning as he proceeded to his work at the American Express office, which custom and the fact that plaintiff customarily used and traveled the same-pathway each morning was then and there well known to the defendant, its agents, servants, and employés; that, immediately following the kicking of the said cars onto the switch track to the north of defendant's main line, the servants and employés of the defendant engaged in such switching also carelessly and negligently kicked certain other cars onto the other switch track located on the south side of defendant's main line track, and along which latter track plaintiff was then and there walking on said cinder walk and pathway; that the cars kicked onto said switch track approached plaintiff from the rear, and plaintiff had no warning of the fact that the said cars were to be kicked onto the said switch track, proceeded in the same direction that plaintiff was going, making but little noise, and with no employé of defendant stationed on the front end thereof in the direction of which said cars were proceeding to control said cars, or to give warning to plaintiff or any other person who might be in danger of being struck thereby; that plaintiff was violently struck and knocked down by the aforesaid cars, thereby sustaining the injuries hereinafter complained of; that after said switch had been set for the throwing of said cars onto said switch track south of defendant's main line, but before same had been kicked loose from the other cars and onto said track, the brakeman of the defendant, who was then and there operating said switch, saw plaintiff's proximity to said switch track onto which said cars would be kicked, and saw, realized, and discovered the peril of plaintiff, and before said cars had been kicked upon said track signaled to the engineer and fireman operating the engine that was then and there engaged in switching said cars not to kick or push said cars upon said track, but the engineer and fireman, then and there negligently acting in the premises, failed to observe and heed said signal, as they could and should have done had they been then and there exercising ordinary care in the matter of operating said engine.

"Paragraph 3. Plaintiff alleges in the alternative that, if the said brakeman of the defendant did not signal to the engineer and fireman then and there in charge of defendant's engine, engaged in switching said cars, not to kick or push said cars on the said track where plaintiff was walking, then said brakeman nevertheless discovered the perilous position of the plaintiff before said cars were kicked onto the said track, and that he then and there negligently failed to use the means at his command to prevent the said cars being kicked onto said track and run against and upon the plaintiff, and that said brakeman and the other employés of the defendant in charge of the switching of the said cars, after they had discovered the perilous position of plaintiff, negligently failed to give plaintiff any warning of the approach of said cars."

"Paragraph 6. That the aforesaid accident which befell plaintiff, and by reason of which he suffered the said injuries hereinbefore complained of, would not have happened if those charged with the duty of the management of defendant's said cars had used and exercised ordinary care; and such injuries of plaintiff were due to and approximately caused by the carelessness and negligence of the defendant, its agents, servants, and employés, in this, to wit:

"(a) In making a double flying or kicking switch across a public street in the said city of Nacogdoches, when the same was not necessary for the proper handling of the said cars that were then and there to be switched, the making of said double flying or kicking switch being in direct violation of the rules for the handling of cars adopted and promulgated by the defendant among the employés of the defendant, and being in violation of the duty that defendant owed to this plaintiff and other licensees using said pathway over and along its said track and yard to avoid injuring such licensees by the handling of its cars.

"(b) In that the servants and employés of the defendant then and there switched the said cars by kicking the same onto the aforesaid tracks without giving any warning by bell, whistle, or otherwise to plaintiff of their intention so to do.

"(c) In that the servants and employés of the defendant then and there kicked or switched said cars onto said tracks at a high, dangerous, and unreasonable rate of speed across said public street and along said pathway, knowing that the same was then and there being used by the plaintiff, and knowing that plaintiff was likely to be struck and injured thereby, and without giving any warning to the plaintiff that same were to be kicked onto said track, and without having any employé of the defendant on the said cars to control the movement thereof, and to prevent same from running into and colliding with the plaintiff.

"(d) In that the servants and employés of the defendant, when the aforesaid second string of cars had been kicked onto the switch track to the south or east of defendant's main line, then and there saw and discovered plaintiff's perilous position from the approach of the said second string of cars in time to have warned him of such approach, and, notwithstanding they saw and discovered plaintiff's perilous position, they failed to give him any notice or warning of the approach of the said cars.

"(e) In that the kicking or making of the flying switch of said second string of cars onto the switch tracks of defendant to the south or east of its main line track was then and there wholly unnecessary in the proper handling and switching of the said cars, and in that the same was in direct violation of the rules of defendant company prohibiting the making of running or flying switches, except when abso-

lutely necessary, and in that the same were made over and upon a public road and street crossing, in violation of the said rules of the defendant company.

"(f) In that the servants and employés of the defendant then and there made such flying switch with the aforesaid second string of cars, without first having examined and set the brakes thereupon for the purpose of preventing said cars from proceeding down said switch track at a high and dangerous rate of speed, and for a distance sufficient to run down and strike plaintiff, such failure to test and set the brakes on said cars being in violation of the duty the defendant owed this plaintiff, as a licensee, and in violation of the rules prescribed for the handling of cars by the defendant company.

"(g) In that the servants and employés of the defendant then and there made said flying or kicking switch of the aforesaid second string of cars onto the said switch track to the south or east of its main line without then and there having stationed on the front end of the approaching cars a brakeman or other employé of the defendant for the purpose of controlling and stopping said cars and preventing injury to persons traveling upon said pathway and in said yards, in violation of the duty that defendant then and there owed this plaintiff to exercise ordinary care to prevent injury to plaintiff from the handling of said cars, and in violation of the rules adopted and promulgated by the defendant among its employés for the handling of its said cars.

"(h) In that the servants and employés of the defendant then and there made a flying switch of and kicked the aforesaid second string of cars onto the said switch track to the south or east of the main line, leaving and permitting the said cars to proceed down the said track on a down grade, when said cars, of their own momentum, would, and did, continue to run down said track, and without having a switchman, brakeman, or other employé of the defendant in charge thereof to control and stop the said cars, which was in violation of a duty that defendant then and there owed to this plaintiff and others using this pathway, and in violation of the rules and regulations prescribed by the defendant company for the handling of its cars by its servants and employés.

"(i) In that the servants and employés of the defendant then and there engaged in switching said cars onto the aforesaid switch tracks of the defendant failed to exercise ordinary care to keep a lookout for plaintiff, and other licensees traveling over and upon the said pathway through the yards of the defendant.

"(j) In that the engineer and fireman then and there operating the engine engaged in said switching negligently failed to observe and heed the signals given by other employés of defendant, and carelessly and negligently pushed and kicked the cars that struck plaintiff onto said switch track to the south or east of the main line track after they had been signaled not to do so.

"(k) In that the servants, agents, and employés of the defendant then and there engaged in switching the said cars discovered the perilous position of plaintiff on or near said switch track, and saw and knew that the approach of the said cars was not known to plaintiff, and that he would be struck thereby, and that they nevertheless failed to use the means at their command to stop said cars before same struck plaintiff, and failed to use the means at their command to warn plaintiff of the approach of the said cars in time for him to get out of the way of said cars and avoid injury thereby."

Appellant's answer consisted of a general denial and plea of contributory negligence on the part of the appellee.

The jury, in answering special issues submitted, found the following:

(1) That at and prior to the time of appellee's injury appellant's roadbed and yards at the place where the injury occurred had been customarily used by pedestrians as a passway for such a length of time as to bring notice to the employés of defendant making the switch in question that people were likely to be traveling or using said roadbed and yards for such purpose at the time of the accident.

(2) That the agents and employés of appellant were guilty of negligence in making the flying or kicking switch of the cars that struck the appellee.

(3) That such negligence was a proximate cause of appellee's injuries.

(4) That appellant's servants and agents who were making such switch of the cars which struck appellee failed to give any warning by the bell or whistle on the engine of their intention to make such switch of the cars.

(5) That such failure on the part of appellant's servants and employés was negligence.

(6) That such negligence was a proximate cause of appellee's injuries.

(7) That appellant's servants and employés were guilty of negligence in failing to have some employé on the front end of the cars that struck appellee, for the purpose of controlling such cars.

(8) That such negligence was a proximate cause of appellee's injuries.

(9) That appellant's servants and employés, in switching the cars that struck appellee, failed to keep a reasonable lookout for people who might be using appellant's roadbed and yards at the time of the injury, and that such failure was negligence on the part of such employés.

(10) That such negligence was a proximate cause of appellee's injuries.

(11) That appellant's brakeman, Will Dukes, saw and realized appellee's perilous position as the cut of cars which caused the injury approached him in time to have warned or informed appellee of the approach of said cars, so as to have enabled appellee to have avoided contact with said cars.

(12) That appellant's brakeman, Dukes, after so discovering plaintiff's perilous position, failed to give to appellee such warning as an ordinarily prudent person would have given under the same or similar circumstances.

(13) That an ordinarily prudent person, under the same or similar circumstances, would have traveled along and across the track where appellee was injured as did appellee.

(14) That appellee was not guilty of contributory negligence.

235 S.W.—22

Thus it will be seen that the jury found that appellant was guilty of negligence in several particulars, which proximately caused appellee's injuries, and also acquitted appellee of contributory negligence. Appellant's main contention in this court is that upon the undisputed facts, as disclosed by this record, appellee was guilty of contributory negligence as a matter of law, and that the evidence in the record does not sustain and was insufficient to raise the issue of discovered peril. As bearing upon these contentions, we have given the record most careful consideration, and have reached the conclusion that these contentions by appellant must be sustained. We concede at once that there was evidence sufficient to warrant a finding by the jury that appellant was guilty of negligence in at least some of the particulars as found by the jury, and that such negligence became and was a proximate cause of appellee's injuries, and therefore it is entirely unnecessary to dwell upon that matter further. We have reached the conclusion also, however, that appellee's own evidence in this case conclusively shows that he was guilty of contributory negligence, and that there was no issue of fact for the jury in that connection, and, further, that the evidence in this case, when fairly considered in its entirety, failed to raise the issue of discovered peril.

At the time of appellee's injury, he was an employé of the Railway Express Company, the office of which company was just north of appellant's depot and station in the town of Nacogdoches. Appellee at the time lived south of appellant's depot, station grounds, and railroad yards, about half a mile distant, and each morning about 7 o'clock he would leave home for the purpose of going to the express office for the discharge of his duties, and usually traveled along appellant's main line north and through its yards to the express office.

On the morning of the injury appellee left home at the usual time, and proceeded up appellant's main line, with a view to the discharge of his duties in the express office, and about the time he reached Cox street in the town of Nacogdoches, which crosses appellant's main line track some several hundred feet south of the depot and station grounds, he met a freight train of appellant, which at the time was engaged in a switching operation. This train had come in just a few minutes before from the town of Lufkin, and on first reaching the yards at Nacogdoches the engine had gone in on what is called the house track in appellant's yards at Nacogdoches, and had connected with and was pulling out a string of box cars, consisting of 14 in number, taking them south with a view to getting them on the main line, and then switching them back on side tracks in the yard, where they were desired to be put. It seems that appellant's main line track runs nearly north and south

through the town of Nacogdoches, and on each side of the track there are spurs or side tracks leading off from it which are controlled by means of switch stands, etc. On the west side, as we will term it, of the main line track going north, is a side track called track No. 1, which bears off in a northwesterly direction from the main line track, and on the east side of the main line track is a track called the house track, which bears off from the main line track in a north or northeasterly direction. These two switch tracks, as we gather from the record, leave the main line track just north of where the same is crossed by Cox street. The testimony showed, without dispute, that appellant's yards, and especially the space between the house track and the main line track, had been for a long period of time before appellee's injury used by the public in general, and by appellee and other employés of the express company, as a passageway to and from appellant's station house and depot and to and from the express office where appellee worked. In other words, the evidence in this case shows clearly to our minds that appellee was a licensee in appellant's yards at the time he was struck and injured. The testimony further shows, without dispute, that about the time appellee got to Cox street the engine, as before stated, was pulling out this string of cars from the house track, and appellee passed in a few feet of the engine engaged in this operation, and at the time spoke to appellant's engineer on the engine, and immediately passed on north, in the direction of the depot and express office, walking in a cinder path between appellant's main line and the house track to the right. He also, about the same time, passed one of appellant's brakemen at a switch stand and spoke to the brakeman. After he had proceeded in a northerly direction some 150 or 170 feet, after he got on the road after passing the engineer, and while yet walking in the cinder path between the main line and the house track on the right, appellee observed a string of four cars that had been switched on to tract No. 1 on the west side of the main line track, as before mentioned. These four cars were not connected with the engine, but had been detached therefrom, and the switching operation was what is known as a flying switch. When appellee discovered these four cars to the left of the main line, as they proceeded up track No. 1, he bore to his right from the main line, as he stated, because, as he said substantially, it was just instinct on his part to do so, and after making a few steps, after discovering these four cars to the west of the main line, it dawned upon him, or occurred to him, to go by the car repairer's "shanty," which was something over 150 or perhaps 200 feet north of where appellant's track is crossed by Cox street, for the purpose of telling the

car repairer, who was an employé of appellant, that he did not bring the pail of milk that he usually brought to the car repairer each morning, but that appellee's father would bring the milk. This "shanty" was still east of the house track and just across it, and in order to reach it appellee, of course, would have to cross the house track. In crossing the house track he did not attempt to do so exactly at right angles, but, as he stated, stepped upon it and was walking diagonally along the track, and while in this position he was struck by the end of a box car that was being switched down the house track (there being two of these cars), and was knocked down and his left leg was so injured that it was necessary to amputate it, as before stated. There was no employé of defendant on either of these two cars which were kicked in on the house track to control them or to give warning to any one of their approach, and when appellee stepped upon the house track, with a view to crossing over to the "shanty," these approaching cars were within 6 or 8 feet of him, and, according to the evidence the speed of these cars was somewhere about 4 or 5 miles an hour. The undisputed testimony shows that appellee did not see these cars approaching on the house track and he testified that he did not hear them, but he also testified, substantially, that if he had been listening at the time he stepped upon the house track, he probably would have heard them. The testimony further shows, without dispute, that by merely casting his eye to the right before stepping upon the house track, or at the time thereof, appellee could have seen the approach of these two cars and avoided any contact with them, but, when asked why he did not look in the direction of these approaching cars before going upon the track, he merely stated, substantially, that he was not in the habit of looking over his right shoulder. He said, among other things, too, that he knew that there was a whistle on the engine, which he frequently heard from his home, and inferentially that he was relying upon this whistle to give him warning of the approach of any cars along that track. In order that there may be no misunderstanding or mistake as to the effect of appellee's testimony in this case bearing upon the issue of his own negligence we shall quote therefrom. Among other things, he said:

"I crossed Cox street. The path I traveled is on the right-hand side of the main line. There is a well-beaten path leading down to and past Mr. Hill's shop (he means by Mr. Hill's shop the car repairer's shanty), in fact, on to the passenger depot there. I was following on the right-hand side of the main line, cross the house track right up here, and I came off the main line twice; moved on down something like this on to the team track. I got up here and I noticed a string of cars coming on this passing track. I turned to my right, after crossing the house track (meaning the switch stand where the house track leaves the main line), I taken some 10 or 15 steps here to my right, going in a northerly direction towards the depot or car repairer's office. I was hit possibly 30 feet this side of that office, south of the office. It is marked there 63 feet from that office to this switch stand (meaning that it was 63 feet from the car repairer's shanty to the switch stand of the house track). I stated I was hit about 30 feet south of the office. That would be about halfway between the switch stand and this office. When I was hit, the moving car struck me in the back first, coming from the south. They were moving on the house track when the car struck me. The house track is here. Cars were coming from the south, going north. When it hit me, it pitched me forward on the right-hand side of the track, the house track. The cars over on the passing track called my attention (he means by passing track track No. 1, which was on the west side of appellant's main line), and when the car hit me it turned me a somersault. * * * I think the colored brakeman was the first man to me. * * * I reached Cox street that morning something between 7 and 8 o'clock. I left home just as the 7 o'clock whistle blew. The whistle was blowing as I walked out the gallery. I think it must have been something like 7:15 possibly when I reached Cox street. As I came to Cox street this train was pulling back, going south. The train was moving south as I went down. The car that struck me was going north. After I had crossed the house track on the right-hand side of the main line, rather before I came to the house track (meaning before he reached the point where the house track makes off from the main line), I looked back and saw where a string of cars were there on what I call the passing track on the west side of the main line. They were kicked loose, I suppose. They were coming in on that track, anyway. I don't know whether they were detached from the locomotive or not. They were coming in on this track over to the west of there, not the track I was on. When I looked back and saw that, I was fixing to cross the house track going on, between the house track and the main line. After I crossed the house track (meaning the point where the house track leaves the main line), I was going about due north. I looked to my left, and these cars were coming down by me some 20 or 30 or 35 feet on my left on what we call the passing track, on the west side of the main line. Those cars were kicked loose, I suppose. They were coming in on that track, anyway. I don't know whether they were detached from the locomotive or not, coming in on this track to the west of that. When I looked back and saw that, I was fixing to cross the house track going on, between house track and main line. After I crossed the house track I believe I was going something like about due north. I looked to my left, and these cars were coming down by me some 20 or 30 or 35 feet to my left on what we call the passing track. That was on the west side of the main line. When I got to this point about here, I looked back, and saw these cars coming down here west of me, coming off from the main line, off on the passing

track. They went down the passenger or passing track. Those cars that struck me in the back came in on the house track after the first string of cars pulled in on this passing track, because they were going on by. I turned my head and saw these cars coming down there in the yard. I did not start toward that string of cars. I turned to my right away from them. As I got there, those that were turned in on the house track struck me in the back. Those cars over on the passing track were still moving on towards the freight depot at the time I was struck by the other moving cars. I did not know they were aiming to kick any other cars other than these I saw passing on my left. Those cars that were on the west on the passing track were, I suppose, some 30 or possibly 35 feet from me to my left. They were moving at the time the cars on the house track hit me. After I was hit I couldn't tell how many cars there were in the string of cars that came down the house track, but they had already passed me. Just to look at those cars, they went some 40 or 50 yards down the track after they ran over me, down the house track. As I came across Cox street, the train and cars were backing up, going south. The locomotive was pulling a string of cars, traveling south towards Houston. It was headed north, the front of the locomotive, towards the string of the cars. As the locomotive carried this string of cars out on the main line, it was backing up. There was no other string of cars or train other than the one as I passed by going down that direction. I spoke to the engineer as he passed. I hollered at him and told him good morning, on the right-hand side of the main line. If the engine was headed north toward Shreveport, the engineer would be on the right-hand side. I passed him, some 4 or 5 or possibly 6 feet from him, as he went back from the compress switch, and I spoke to him. After I passed I also saw this yellow-colored brakeman who was in here a few minutes ago. He was standing about the switch pole that leads out onto track No. 1 or the passing track. He was standing at the second switch from Cox street. That is the switch that he would operate if this string of cars were kicked by the engineer back on this passing track. I passed him some 14 or 15 feet from him and said good morning, and continued down on the right-hand side as I have detailed to you. I suppose it was less than half a minute after I had told him good morning and walked on before I saw this string of cars coming on the passing track and before the string of cars on the house track hit me. I was walking fast that morning. Assuming there was a brakeman on top of that string of cars that passed down this passing track, he could have seen me. I would have been something like 35 or 40 feet from him. If he was on those cars that went down the passing track, there was nothing between him and the other cars coming down behind me on the house track. If he had been on top of the cars going down the passing track, I don't think he would have been in excess of 30 feet from the cars going down on the house track. I didn't know any cars were coming on that house track at all. The first time I had any information that there were any cars coming on that house track was when they struck me.

That was a locomotive engine drawing those cars. I have seen locomotive engines. That was an engine of the H. E. & W. T. Ry. Co. As a rule they have a bell and whistle on those engines or signals and things of that kind. From the time that engine passed me going out until that first string of cars came by, there wasn't any warning whatever given, either by bell or whistle. I always heard the whistle when it was blown before out at home. Nothing whatever was done with the whistle that morning. From the time I passed the engine until the cars hit me on the house track no noise was made by the whistle. The bell was not rung. I guess it was possibly half a minute or a minute after I was struck before this brakeman got to me. That was the same brakeman that I passed up at the switch. The first I knew of him he was standing just across the main line from me. When I raised up with my leg gripped in my hands, I was facing east and was calling for some one to come to me. I looked back over my shoulder, turned around, and saw this colored brakeman standing there, about 14 or 15 feet. I said, 'Please come to me and help me.' That was the same one I passed and spoke to.

"I am familiar with that situation that I have been testifying about, and the character of the ground, and whatever there may be on this side of the road and west side of the track. There is no obstruction whatever from the road on the side of this track up to where I passed this engine down to the point where I was hit. I have been there since to see whether there is from the point where I was hit back up that side or the right-hand side of the engine, down there by the side of the track, and I then had a clear view. There was nothing whatever that could obstruct or intervene between me and the right-hand side of the engine down by the side of the track. The main line is straight from Cox street on to the depot, the passenger depot, but it bears a little bit back east; makes a slight curve to the east going from Cox street. It doesn't to say curve; just seems to bear off a little bit. * * * I have been through it a number of times; have seen them switching often. I have never before that time, in passing through the yard, observed any of the employés making what they call a double flying or kicking switch. * * * I supposed the place I was in was safe (he meant the cinder walk between the main line and the house track where he was traveling before he stepped upon the house track); if I had stumbled I might have fallen down. I was walking along perfectly safe. When I met that train I was just above the ice plant, when the locomotive passed me, south of the ice plant. I met the locomotive backing south, and I was coming north. That locomotive at that time had a long string of cars attached to it. The head of the engine was pointed north. I knew that engine and those cars were not on their way down to Lufkin. I thought the engine was switching cars, and knew how things were done. I supposed they were switching. I spoke to the engineer; as I walked along by the side of him, I told him good morning, and he spoke to me. As I came along the last one of that string of cars passed me somewhere about Cox street, going the other way. That was the end of the cars that passed me about

Cox street. * * * Switches usually stay closed, most usually. Cars are usually on this team track, the one down here on the switch track by the freight depot. They stand on all those tracks all through the yard at times. Various and sundry times I have seen those tracks filled with cars. They are put there with an engine, either kicking or pushing them in on the tracks. I have seen them when they were making up the trains and when they were braking them up, and that is the way they do it. * * * When I passed the engineer up here, I told him good morning. So far as I know and so far as any information that I gave him, he didn't know where I was going, except he knew I worked at the express office and knew I was on my way to work. When I got here, crossed what I term the house track, going north, crossing the house track (meaning where he passed the switch stand), if I had kept on between the house track and the main line, I wouldn't have gotten hurt. There was plenty of room for me to have walked there in safety. Sure, if I had not have turned at right angles, crossing the track at the point marked C (meaning the point where the accident occurred), I would not have been struck, if I hadn't have stepped on the track. That was a safe place for me to walk, between the tracks, on to the express office. I seen these cars coming. (The reference was to the four cars on track No. 1 west of the main line.) That was a safe place for me to walk; there wasn't anything at all about that to get me hurt there. Certainly I didn't tell any one working for the railroad company I was going to cross that track just before I did cross it. I was just walking along there; no one then knew I was going to attempt to cross diagonally that track that was working for the railroad company, so far as I know. The cars that were moving over to my left came right by the side over here. They were moved on past me. Some had done passed. That was the first track west of the main line. I don't know how many cars were there; I never took any notice of the number; I couldn't say whether there were two, three, or four. They were just even with me as I saw the cars coming by. I was walking north. I didn't see those cars that were on the first track west of the main line until they got even with me and passing me. I then looked to the left, that would be to the west, looking right in the direction I saw the cars then passing me on this line, which was the first line west of the main line. I think I was in a safe place from those cars. I never took any notice of those cars as to whether there was any one on them. There was nothing whatever to direct my attention to those cars before I got there; they were just moving cars. I thought something about those cars passing; it always makes me back away from the track whenever I am around the express office and a train is switching. There was nothing particularly to call my attention to those cars passing on the west of the main line except just natural to get as far away from any seen danger as possible. When I saw those cars, it never occurred to me, except to just get as far away as possible; just the natural instinct to get away from any possible danger. I was moving away from those cars.

When I stepped out on the ties certainly there was a cause for it. When I saw those cars west of me on the first line west of the main line, even and passing me, I stepped as far away from them as I could. It never occurred to me they might hit me; just natural to get as far away from them as possible. * * * When I started across the house track at the point marked C (this point is where the accident occurred), I only looked at the cars passing on my left. As to whether I looked back south to see if any cars were coming in on the track I was crossing, will answer I don't hardly ever look over my right shoulder; therefore I didn't look south to see if any cars were coming. I looked back when I started to cross house track the first time to make sure the cars were going to stop. I looked back to see if the cars were standing on the left side of the main line, and it was safe to walk across. * * * Just before I started to cross the track at the point marked C, if I had turned directly around I could have seen those cars; if I had turned to my right, I could have seen them coming; there is no doubt about that. There was not a thing on earth to have kept me from seeing them had I turned towards them and looked. All I would have had to have done would have been to turn my head and see those cars coming; turned and looked back. I didn't do that; I didn't look back. Certainly I wouldn't have attempted to cross over those ties if I had looked back and seen those cars coming. The roar of these other cars passing me on the left kept me from hearing those cars coming. Certainly those cars were making noise as they passed. All cars do, I think; all cars make a noise. These three or four cars I heard going north on the west side of the main line, I could hear those cars making a noise; they were making pretty good speed as they came by, making a noise so you could hear them pass. These other cars that ran over me doubtless were making a noise, but I didn't hear it. Possibly, if I had been listening for them, I could have heard a noise back that way, but my attention was attached down here, and therefore I was not listening for a noise back that way. As to whether I was listening for a bell and whistle on that engine that I had seen up there, will say possibly I didn't have my mind attached to it at the time. I didn't have my mind attached to it, and wasn't listening whether the bell had gone to ringing at the ice plant or not; I wasn't listening for it; I couldn't say I was giving it any thought. I wasn't thinking about the bell or whistle, either one, at the time. I was going about getting out of danger, I suppose, as far as I possibly could. I crossed the track—suppose the tracks must have been about 4 feet wide—and taken four or five steps to go across in a place going angling to the northeast. I was crossing the track diagonally, approximately something similar to that. As I stepped on the track, I was then walking down the track in a measure, going down and crossing at the same time. I got struck before I passed over the east rail. I think I must have been between them; might have had my right foot over; don't remember for certain whether my right foot was over the rail or not. Walking that way, the car from behind struck me right along here (indicating). I think the

bruise is right here, a little to the left of my back bone. I don't know whether it was the corner of the car, drawhead, or anything about it, but, whatever it was, I don't think I had gone over 8 feet. From the time I entered on the track I don't think I could have gone over 8 feet before I was struck. * * *"

The evidence of the appellee, as adduced on the trial below, as above quoted, bearing upon the issue of his contributory negligence, is practically all his evidence bearing materially upon that point. To quote more from his evidence on that point would be but a repetition, and no useful purpose would be served by doing so.

It appears from the undisputed testimony in the case that appellee had been in the employ of the express company for a long period of time prior to the injury, and had been working in the particular capacity in which he was employed at the time of his injury for approximately a year, and each day he passed through the yards of appellant, where the injury occurred. The evidence shows without dispute, and in fact it is admitted by appellee himself, as we have shown, that he was thoroughly familiar with the character of switching done in the yards every day. Hence, as he testified, the very train which he met at Cox street, just a few moments before the injury, had then entered the yard for the purpose of switching cars and placing them on the side tracks leading out on each side from the main line. He knew that he left this train behind him as he proceeded north in the direction of the express office. He testified, as we have shown, that he had frequently observed cars standing upon all the switch tracks in appellant's yards, and knew that they were placed there by switching operations. His own testimony, as we have quoted it, shows that there was no obstruction whatever to his view of the approaching car which injured him either before or at the time he stepped upon the house track or while on the house track for the few feet that he traveled. The only reasonable construction to be given to his testimony is that he neither looked nor listened to see whether cars may have been approaching on the house track before he left the cinder path of safety and stepped thereupon. Indeed, his testimony, when carefully analyzed, is to the effect that he was paying no attention whatever for his own safety at the time he stepped upon the house track where he was injured. He stated, substantially, that he did not hear the approach of the cars before he was struck, but in the same breath he stated, substantially, that he probably would have heard the cars if he had been listening or if he had been paying any attention. He also stated, substantially, that by a mere glance to his right he would have seen the approach of these two cars on the house track before

stepping upon it, and that he did not even as much as turn his head in that direction, stating, "I don't hardly ever look over my right shoulder." It is true he testified that his attention had just been attracted by the four cars that were being switched on track No. 1, which was on the west side of the main line, and which four cars had already passed appellee before he stepped upon the house track. He admitted that he was in no danger whatever from these four cars on the west of the main track, and knew that the cinder path between the house track and the main track on which he was traveling was a perfectly safe place for him to walk, notwithstanding the presence of the four cars on track No. 1 west of the main line, and that he knew that he was in no danger whatever, and that there was no occasion for him to be afraid of these four cars on the house track; but he said that it was just natural instinct for him to get away from them, if possible, and about that time, too, he thought of stepping over the house track to the car repairer's shanty, as we have before stated.

[1] Upon these undisputed facts, how can it be said that appellee was exercising reasonable and proper care—that is, ordinary care—for his own safety in this railroad yard at the time he was injured? The Supreme Court of this state long ago announced it as a sound rule of law that it was the duty of one in going upon a railroad track, a place of inherent danger, to use ordinary care with a view of ascertaining whether he might do so with safety to himself, and that, if he failed to use such care, and injury resulted by contact with a train approaching the point, then such person was guilty of contributory negligence as a matter of law, and a recovery would be barred, unless, of course, recovery might be had under the rule of discovered peril. For instance, in the case of Railway Co. v. Kutac, 72 Tex. 643, 11 S. W. 127, the Supreme Court, among other things, said:

"Ordinarily the fact that the customary signals were not made does not relieve a person approaching an open crossing from the duty of keeping a proper lookout on approaching the road. And where a person knowingly about to cross a railroad track may have an unobstructed view of the railroad, so as to know of the approach of a train a sufficient time to clearly avoid any injury, he cannot recover as a matter of law, although the company may have been negligent or neglected to perform a statutory requirement."

In the case of I. & G. N. R. Co. v. Edwards, 100 Tex. 23, 93 S. W. 106, the Supreme Court of this state again said:

"The law is well settled that a traveler approaching a railroad crossing must exercise ordinary prudence in going upon the track to see that he may do so with safety. He cannot excuse the absence of all care by showing that

those in charge of the train have also been guilty of negligence. This is the precise attitude of the plaintiff, when he claims that he was not bound to look out for himself until the statutory signals were given. His claim cannot be admitted without denying the rule which exacted the duty of due care on his part, a duty as binding on him as was the duty of giving signals binding on the defendant. * * * While persons using a railway crossing have the right to expect that the law requiring signals will be obeyed, this is not a substitute for the duty of exercising care for themselves, and they are not excused from that duty by the fault of the other party. No case in this court has allowed a recovery upon facts such as these, and the judgment cannot be permitted to stand without abolishing the rule, recognized by all authority, requiring the exercise of ordinary prudence on the part of persons crossing railroad tracks."

The undisputed evidence in the Edwards Case showed, substantially, that the plaintiff, Edwards, was injured at a public road crossing over the railroad track, and that the accident occurred in the nighttime, but that the headlight of the approaching train could have been seen for a long distance before the crossing was reached, and that Edwards failed to look for the approach of the train before going upon the crossing; in other words, the view of the approaching train was unobstructed, and if Edwards, before going upon the crossing, had looked for the approach of the train, he would have seen it in time to have avoided contact therewith. He testified, however, substantially, that he knew that railroad trains were required to blow the whistle and ring the bell before going over public crossings, and that he was relying upon those duties being performed as his reason for not looking for the approach of the train. The Supreme Court, as the above-quoted language shows, found no difficulty and had no hesitancy in holding that Edwards was guilty of contributory negligence as a matter of law, and a judgment in his favor was reversed and rendered. If the Edwards Case has ever been expressly overruled, or even criticized, by the Supreme Court of this state at any time, it has escaped our notice. We are aware, of course, that the Edwards Case has, on a number of occasions, been invoked by appellant railroad companies where it had no application, and in such instances, of course, both the Courts of Civil Appeals and the Supreme Court of this state have declined to let the holding in that case control. But as late as the case of Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S. W. 139, the Supreme Court of this state has referred to the Edwards Case, not for the purpose of criticizing it in any particular, but merely to show that the facts in the Edwards Case distinguished it from the facts in the Kirksey Case. There was not even an intimation in the Kirksey Case

by the Supreme Court, in the opinion delivered by Justice Hawkins, that the Court was to any extent inclined to criticize the Edwards Case. The rule, as announced in the Edwards Case, was expressly reaffirmed in Boyd v. Railway, 101 Tex. 411, 108 S. W. 813, by the Supreme Court of this state. For instance, in the Boyd Case, among other things, it was said:

"It was the duty of Boyd when he approached the crossing of the railway company's yard on Oak street to use ordinary care to discover and to avoid collision with cars or engines which might be moving across the street. A failure on his part to use ordinary care would defeat his action."

As stated before, we have been referred to no decision in this state which questions the soundness of the rule as laid down in the Edwards Case, and if the law, as there announced, is yet the law, then the appellee in this case was guilty of contributory negligence as a matter of law, and a recovery by him must be denied, unless he was entitled to recover under the rule of discovered peril. We say this for the reason that the evidence of the appellee himself, as we have quoted it, shows, conclusively, that he made no effort whatever to ascertain whether he might step upon the railroad track where he was injured before or at the time he did so. Indeed, the only contention made by his counsel in their brief on this point is that his attention had been diverted by his seeing the four cars that had been switched on track No. 1 west of the main line, and that therefore it never occurred to him to look or by any means ascertain whether cars might be approaching on the house track east of the main line, where the accident occurred. Had the presence of these cars west of the main line and their discovery by appellee afforded any reason on his part to apprehend any danger to himself, and therefore his attention for the moment was upon these cars, there would be sound reason for the contention that, appellee's attention being thus claimed, he might have been excused from having failed to look or listen for the approaching cars on the house track which caused the injury, but appellee admitted, expressly, that he knew he was in no danger by reason of the presence of these four cars west of the main line, and well knew that the cinder path between the house track and the main line, which he was then traveling, was a perfectly safe place for him to be, notwithstanding the presence of these four cars west of the main line, and his only reason for fixing his attention upon these four cars was that it was "natural instinct" for him to bear them in mind and avoid them as far as he could.

Counsel for appellee, in denying that he was guilty of contributory negligence, cite, among others, the cases of Mitchum v. Rail-

way Co., 107 Tex. 34, 173 S. W. 878; Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S. W. 139; Trochta v. M., K. & T. Railway Co. (Com. App.) 218 S. W. 1038. The decision in all three of these cases was by the Supreme Court of this state.

In the Mitchum Case the injured party was a section hand employed by the railway company, and on the occasion of the injury was operating a 'hand car which was used along the line by the section men in repairing the track. At the time of the injury Mitchum was attempting to get the hand car off of the track, so as to prevent a collision between an approaching train of the railway company and the hand car. The attempt to get the handcar off the track was successful, but Mitchum testified that in the attempt his foot slipped and he fell just about the time the car was removed from the track, but he could not recover himself in time to prevent being struck by the train. The Supreme Court in that case, speaking through Judge Brown, held that, if Mitchum was guilty of negligence at all in attempting to remove the hand car from the track, it was not such negligence as would bar a recovery by him. From the opinion as a whole it is very clear what was in the mind of Judge Brown at the time. Mitchum saw the train approaching and in all reason he knew that, unless the hand car was removed from the track, a collision between it and the train would inevitably occur, and that probably many persons upon the train would be killed or injured, and in the attempt to prevent this and to save human life he continued to try to get the hand car off the track so as to prevent this collision, but before he could do so he himself was injured. Ordinary negligence on his part would not and should not have barred his recovery, for in such circumstances nothing short of rashness on his part would have barred his recovery.

In the Kirksey Case the plaintiff had a judgment below, which was reversed and rendered by the Court of Civil Appeals, on the ground that Kirksey was guilty of contributory negligence as a matter of law. The Supreme Court, speaking through Justice Hawkins, held that such was not the case. It will be seen, upon careful reading of the case, that the Supreme Court, in reversing the Court of Civil Appeals on that point, alluded to the fact, with emphasis, that the view of the approaching trolley car in that case was materially obstructed as Kirksey approached the crossing, and that the trolley car was running at a great rate of speed, 60 miles per hour, and just about the time Kirksey had reached a point near the crossing, where his view of the approaching trolley car was not obstructed, a person standing near the crossing and north of the crossing, and in an opposite direction from which the trolley car was approaching, signaled to Kirksey, who was traveling in an automobile, and got his attention, and started in the direction of Kirksey, waving and holding Kirksey's attention, who, in the meantime, was making an effort to stop his automobile in response to the signal so given him, and, his attention being thus attracted and claimed by the signal and approach of the person on the north of the crossing, he failed to discover the approach of the trolley car in time to avoid contact. Justice Hawkins, in commenting upon these facts briefly stated, said that it could not be held that Kirksey was guilty of contributory negligence as a matter of law. Among other things in the opinion, it is said:

"The evidence bearing upon the issue of contributory negligence, although in certain respects conflicting, was such as to authorize the jury to believe and find that as said trolley car approached said public crossing the customary whistle was not sounded, although required by law; that the trolley car approached and passed said crossing at a speed of 60 miles an hour; that decedent was a hotel man, and familiar with the schedules of the traction company's cars, and that this trolley car was proceeding behind its regular time, late in the evening; that from said crossing northwardly the track of the interurban railway runs down grade about half a mile, the effect being to obscure, more or less, the south bound trolley car from the view of a person in an automobile approaching from the east of said crossing, on the public highway or pike, which was on practically the same grade as was said crossing; that in a comparatively short distance east of said crossing, and north of but near said pike, are a residence, barn, and other outhouses, and, further north, another building, the effect being to obscure, more or less, such south-bound trolley car from the view of any west-bound automobile passenger along said pike in approaching said crossing; that a very high wind from the south was blowing; that just prior to said collision Kirksey, in his automobile, on said pike, approached said crossing from the east, passing east and south of said houses at a speed of 30 miles an hour; that as he passed to the south of said house the witness De Loach, standing near them and on the north side of the pike, signaled him, repeatedly, to stop, De Loach's purpose being to obtain a ride to town with Kirksey; that thereupon Kirksey, whose line of vision, after he had passed south of said house, constantly had been directed westwardly, toward said crossing, turned his gaze towards De Loach, and immediately afterward 'shut off' the engine of his automobile, and, slowing down to a speed of 10 miles per hour as he neared said crossing, again looking towards it, but endeavoring to stop to pick up De Loach, who thereupon started towards the automobile; that just before the collision occurred. and just after the air brakes of the speeding trolley car were applied, Kirksey then first became aware of its approach, and endeavored, too late, to avoid it, turning his automobile southwardly, almost parallel with the course of the trolley car, resulting in the collision. the right side of the automobile being seriously damaged, and Kirksey being thrown southwardly through the

interurban railway cattle guard in such manner as to break his neck.

"Conceding that the physical conditions were such that as Kirksey approached said crossing he might have discovered the approaching trolley car in time to have avoided the collision had his thought and attention not been distracted by De Loach's signals to stop and his movement toward the automobile as it slowed its speed, there remained for the jury the question of whether under all the facts and circumstances, including said distractions, a reasonably prudent person, in Kirksey's situation, would or would not have done substantially as he did."

In Trochta v. Railway Co. a judgment was recovered in the trial court by Trochta's wife and children because of his death, which was occasioned by a collision between one of the railway company's passenger trains and Trochta's wagon at a public road crossing over the railway company's track. The trial court's judgment was reversed and rendered by the Court of Civil Appeals; that court holding that Trochta was guilty of negligence as a matter of law upon the findings of fact as made by the jury. We have had occasion once or twice before, and especially in the case of Houston Electric Co. v. Patella, reported in 222 S. W. 615, to refer to the holding in the Trochta Case, and we there, to some extent, commented upon the Trochta Case. The decision of the Court of Civil Appeals in the Trochta Case was reversed and rendered by the Commission of Appeals, the decision of the latter being reported in 218 S. W. 1038. The Commission of Appeals, in reaching its conclusions in that case, did not discuss the holding by the Court of Civil Appeals on the issue of contributory negligence, but expressly confined its discussion to the question of discovered peril, and differed with the Court of Civil Appeals on that issue, and held that there was discovered peril in the case, and that the verdict of the jury and trial court's judgment in favor of Trochta on that issue was sufficiently raised and sustained by the evidence. In approving the disposition made by the Commission of Appeals in that case, Chief Justice Phillips said:

"Under the facts of this case there is, in our opinion, no warrant for not applying to it the general rule prevailing in this state that the failure of one about to go over a public railroad crossing to look and listen for an approaching train does not, of itself, constitute negligence as a matter of law. Here the question as to whether, under all the circumstances Trochta was guilty of negligence in not looking or listening for the train was for the jury. The jury determined it against the defendant.

"For this reason, as well as that announced in the Commission of Appeals, the judgment of the Court of Civil Appeals is reversed, and the judgment of the district court is affirmed."

We confess, as said in the Patella Case, supra, that we are not sure what Chief Justice Phillips had in mind when he used the language just quoted. We feel sure, however, that he did not mean to say, and he did not say, that under no facts or circumstances could a person injured by a railroad train, in going upon the track without paying any attention for his own safety, be guilty of contributory negligence as a matter of law. Among other things said by the Commission of Appeals in the Trochta Case, in stating the undisputed facts in that case, was the following:

"The evidence shows that there was a heavy growth of timber in the angle formed by the public road and the railroad, which prevented one approaching the railroad, as deceased was, from seeing a train coming from the east until he had entered upon the right of way."

The evidence in the Trochta Case showed further that the public road that Trochta was following crossed the railroad track at right angles. Thus it appears that Trochta's view of the approaching train to the crossing, where he was injured, was totally obscured by reason of this heavy growth of timber, which the Commission of Appeals said was in the angle formed by the two lots at the crossing, and this, perhaps, was a controlling fact with Chief Justice Phillips when he made the notation in approving the Trochta decision above quoted. But here, as we have already stated, there was nothing, not even as much as a straw, to obstruct the appellee's view of the cars which were approaching on the house track where he was injured, and there was nothing, as in the Kirksey Case, either in the way of obstructions or that claimed his attention and diverted his mind at the time he got upon this house track, and we have already shown that the holding in the Mitchum Case by the Supreme Court was based upon facts which so clearly distinguish it from this case that no further comment as to that case would seem necessary.

If the appellee in this case, upon the undisputed facts, was not guilty of contributory negligence as a matter of law, then in our opinion there can arise no case of this character in which it could be properly held that the injured party was guilty of contributory negligence as a matter of law.

The next question for determination is whether the appellee discharged the burden which rested upon him to show, by satisfactory evidence, that appellant's agents and servants in charge of the train, engaged in the switching, or some of them, discovered his perilous position in time to have prevented his injury, by the use of ordinary care in the use of the means then at hand. This court, in the case of Houston Electric Co. v. Patella, reported in 222 S. W. 615, had occasion to discuss at some length the rule of

discovered peril, and there several of the leading authorities discussing that rule are mentioned. Among the leading authorities there mentioned are the cases of Railway Co. v. Breadow, 90 Tex. 26, 36 S. W. 410; Morgan & Bro. v. M., K. & T. Ry. Co., 108 Tex. 331, 193 S. W. 134; Galveston Electric Co. v. Swank, 188 S. W. 705; San Antonio Traction Co. v. Kelleher, 48 Tex. Civ. App. 421, 107 S. W. 64; Schaff v. Gooch, 218 S. W. 783; H. & T. C. Ry. Co. v. Finn, 101 Tex. 511, 109 S. W. 918.

[2, 3] We understand that, in order for recovery to be had upon the doctrine of discovered peril, it must be made to appear by the evidence that the injured person was in a position of imminent danger, and that the defendant, or some one acting for him, actually discovered the perilous position of the injured party in time to have averted the injury, by the exercise of ordinary care in using all reasonable means then at hand. We do not understand that counsel for appellee in this case question this rule, but their contention is that the evidence was such as to warrant the jury in finding that appellant's brakeman, Will Dukes, saw appellee in a perilous position, and that such discovery was made at such time as afforded an opportunity to said brakeman to warn appellee of his danger, by means then at this brakeman's command. While the pleadings on this issue were broad enough to embrace any and all employés of appellant in handling the train, yet it is conceded, as we understand it, by counsel for appellee, that there is nothing in the evidence upon which to base the contention that any employé, other than the brakeman, Will Dukes, discovered appellee's perilous position in time to have prevented the injury or that any of them, other than the brakeman, Dukes, was in any manner chargeable with a failure to prevent appellee's injury after his peril was discovered. If the issue of discovered peril was raised by any evidence in this case, it was that of the witness Will Dukes, one of appellant's brakemen, who was engaged in handling the switching operations on the occasion of the injury. Counsel for appellee have made a statement in their brief showing what the evidence of this brakeman was, and which they contend raised and sustained that issue. We copy that statement in appellee's brief, which is as follows:

"I live at Lufkin, Texas. I am working for Mr. Harry Phillips on the H. E. & W. T. Railway Company. I am a brakeman, and have been since September, 1905. I was one of the brakeman the morning Mr. Barron got hurt down in the yard.

"In getting those cars, they got them off the house track and backed out from the house track, back west on the main line. We call that south here. When the engine broke up the cars on the house track, I suppose I got up on top of the box car and let the brake off the cars. The engine went on out on the main line and then went back up to No. 1 switch. The first cars that were switched, we switched them from the main line to No. 1. As the engine took the cars out, I got on top of the cars to let the brakes off, so I could handle them. The first four cars went down on No. 1. and I went on top of them. I was standing on the west end on the back end of the cars, on the south end. My reason for riding those four cars in was, when we first got there, we always head in on No. 1 track and leave our caboose, and when we were leaving the house I heard the conductor say No. 1 with four, and I was just up there letting off the brakes, and I thought I would just stay. When they put the four cars off down No. 1, then I started back there to keep them from hitting our caboose. I stayed up there until they stopped, but they didn't hit the caboose. After these four cars went down the No. 1 track, two more cars went back towards the house track. That is on the right-hand side of the main line going towards Shreveport.

"I saw the accident. With reference to where I was at the time I saw the accident, whether I was just even or had passed him (meaning the appellee), will say I was just past him about a car, maybe two car, lengths towards the E. & W. freight depot; there when the accident happened. I had gone a little further this way.

"The four cars I rode down No. 1 track, I rode them until I got them stopped, and after I got them stopped I made an attempt to come down the ladder off the cars. I turned around to check these two cars coming up towards the main line. I went up towards the house track, and just as I made an attempt to run around and come down the yard I seen the accident when it happened. I pulled off my hat. and commenced hallowing and flagging as loud as I could, but the two cars had done come off. When I saw Mr. Barron, with reference to those two cars, I reckon about one or two steps, looked like he had started from the south side of the house line up towards the main line, when I was hallowing, and I reckon about 6 or 8 or 8 or 10 feet, something like that. I was hallowing and flagging with my hat, and by that time the two cars had done struck him.

"That is track No. 1; that is the main line; that is the house in there that leads off from the main line; that is the house in there; that switch is somewhere along there. I seen the gentleman between these tracks, the team track lead and the switchman's shanty along there. When I seen the gentleman, it looked like he was in the lead, somewhere along there. I couldn't tell whether he started to his left or right; he went back that way; he fell back with his head towards Houston. When I saw him, the cars were something like 6 or 8 feet, as near as I could tell, from him. I just figure on it being about the same time of me hallowing that I saw him turn to get up on the track. It didn't look like he had time to go but a short distance; didn't look like me hallowing done any good, me hallowing and flagging with my hat. I think the car was in 6 or 8 feet of him at that time, something like that.

"With reference to the man getting hurt, before I got off I flagged with my hand and hallowed. I couldn't tell you what all I didn't

hallow. I couldn't tell you what I said; I don't know. I hallowed. I first flagged with my hat and then hallowed. I might have been hallowing and flagging at the same time he was hit. I hallowed as loud as I could. I cursed I reckon. I said, 'God damn;' that is all I remember saying. I had never gotten down then off the cars. After he was hurt is when I got off the cars. I was about a car and a half from Barron when I was waving my hat signaling with my hat and said that; I was hallowing that; I don't know whether he heard it or not; I hallowed loud enough for him to have heard it. I saw these other two cars rolling while I was on the four cars, and they were rolling; after I got the four cars stopped I saw them. I did not see the other two cars rolling in on the house track before I stopped the four cars. I never paid no attention. When I looked over that way Barron and the car were about 6 or 8 feet apart. I never looked back before that time, not until I got these four cars checked and stopped with the brakes.

"Nobody was on the two cars that hit Barron. They were aloose from the engine. They just came down that track. I was up there on top of the four cars to keep them from hitting the caboose. I was looking towards the caboose, which was on No. 1 track; my caboose was down here. I didn't see the man walking down there. There was no obstruction that I could see from where I was down to the house track. I was standing upon these cars going towards the caboose, and didn't see the man at all until after I passed and had gone a car and a half beyond him, and I set my brakes, and then as I went to turn to get down I saw these other cars coming. That is the outside rail. Here is the house track. When I first saw him he was between the switch and the car shanty. I didn't see him walk across the track in front of the cars. He was just next to the south rail. He was coming towards the freighthouse. He was walking near that right-hand rail coming around on sorter, upon the track, and going towards the E. & W. depot, when I first saw him, and he continued to walk there until the car hit him. I suppose it was 40 or 50 seconds from the time I first saw him until he was hit—short space of time. I saw him walking there before the car hit him. I don't know what distance he was in front of the car. I suppose something like 6 or 8 feet, something like that. I don't know whether it was 12 feet or not, that much; as short a distance from here to you, maybe not so far. The cars were rolling 4 or 5 miles an hour, just rolling down the tracks. He didn't seem to see the cars coming at all. They were coming from his back. I could tell from the way he was walking that he didn't know the cars were coming behind him. The reason I didn't hallow to him to get out of the way, I said the first thing that come to my mind. I first hallowed to get out of the way. I didn't say, 'God damn,' until after the car had done hit him. I don't recollect telling him to look out the cars were coming on him; I didn't say anything but just hallow. I didn't call any particular name or any particular man, but just hallowed, just exclaimed because I saw the situation. I flagged and hallowed. I didn't say, 'Mr. Man, those cars are coming.' I might have said, 'Look out for those cars behind you;' I won't say. He was out near the right-hand rail. If he had taken one step he could have stepped out of the way. The cars were 6 or 8 feet from him when I first saw him. One step to the right-hand side would have put him in the clear of the cars. He was walking along there and could have stepped over out of the way and the cars would have passed him. Speaking about 40 or 50 seconds, I don't know what length of time it was; I just suppose it would be 40 or 50 seconds; I am just guessing at the time. The distance I speak of, 6 or 8 feet, that is when I saw the cars were in 6 or 8 feet of him, and I hallowed and he got hit. My name is Will Dukes. I was one of the brakemen."

We have quoted in full the evidence of the witness Will Dukes, as set out in the statement of appellee's counsel in their brief, in so far as the same bears upon the issue of discovered peril; and, while the statement is not as clear as it might be, yet it is manifest to us, from this negro's evidence, which counsel for appellee contend raises and sustains the issue of discovered peril, that appellee's perilous position, when he stepped upon the house track where he was injured, was not discovered by this negro in time for him to have prevented appellee's injury by the means which were then at his command. It is perfectly clear from this negro's evidence that appellee was not discovered by him to be in any position of danger until the approaching car which struck him was somewhere between 6 and 8 feet of appellee, and, while the negro said something about 40 or 50 seconds during the time this perilous position continued, it is clear from his entire testimony that it was the rankest guess as to such time, and that the time elapsing between this negro's discovery of the appellee in his perilous position and the actual striking of him by the car was so short that it negatives any reasonable conclusion that this negro, by such means as were at his command, could have prevented appellee's injury. Appellee had testified himself, as we have quoted him hereinabove, that he had not gone in excess of 8 feet on the track at the time he was struck, and therefor the negro's testimony that he was within 6 or 8 feet of the approaching cars when he stepped upon the track is corroborated by the appellee himself. Now, in view of this situation, what could this negro brakeman have done? What choice of means had he at his command? It is admitted that the cars that struck the appellee were not attached to the engine, but had been kicked loose and were traveling up the house track with no one on them to control them. No signal to the engineer by this brakeman could have availed anything. The negro himself had no whistle to blow or bell to ring, and the time intervening between the time he discovered appellee's peril and the actual injury would not have permitted him to have com-

municated with the engineer, some several hundred feet south on the main line, for the purpose of having the engineer blow the whistle or ring the bell, even if such warning would have availed anything. The only thing that the negro could do was to make an effort to attract the attention of appellee, after discovering his peril, and that had to be done before the approaching cars had time to travel a distance as short as 6 or 8 feet. It is admitted that the appellee's back was turned towards this negro, and therefore he could not see the negro, who was frantically waving at him. The negro testifies most positively that he hallowed as loud as he could, with the hope of attracting appellee's attention by that means, and at the same time was flagging with his hat and hands for the same purpose. While this negro did say, as shown in the statement of his testimony, that it appeared to him that appellee was unaware of the approaching danger, in the same connection it fully appears, beyond any question in · our minds, that this negro did all that lay within .his power to warn appellee of this approaching danger during the short time that was permitted him to do so, and that his failure to get appellee's attention and thereby ·save him was not because of any failure on his part to exercise ordinary care in the use of the means then at his command to prevent appellee's injury. It must be borne in mind that appellee was in no actual danger, or apparent danger, so long as he continued walking between the house track and the main line going in the direction of the express office. As long as he walked on the cinder track between those two tracks he was perfectly safe, not only in fact, but apparently so, and was, in fact, using a path that he claimed he had a legal right to use, and where all persons walked with safety while trains were being operated in the yards. So there was nothing, so long as appellee remained in this cinder walk between the house track and the main line, to cause this brakeman to apprehend that he would suddenly start across the house track in front of the approaching cars on that track, even if this brakeman had discovered these approaching cars on that track before he did in fact discover them. The only danger, real or apparent, that appellee was ever in before he was struck arose at the moment he suddenly started across the house track from this cinder path, and at that time, under the undisputed testimony, these approaching cars which caused the injury were between 6 and 8 feet from him.

Now, it is true appellee testified that he did not hear the negro hallow, and that the negro did not hallow, and therefore, counsel for appellee, in their brief, contend that it was a question of fact for the jury to determine whether the brakeman, Will Dukes, hallowed at all, or used such means as were at his command to prevent the injury. It may be true that appellee did not hear this brakeman hallow, as he testified, but appellee also testified that he did not hear the approach of these cars to him, either at the time he stepped upon the track ahead of them or while on the track a few feet before they struck him, but in the same connection he also said that he was not listening for anything of the kind, and was not expecting anything of the kind, and had no thought of anything of the kind, and from the evidence of other witnesses in this case, as well as that of the negro, it absolutely forces the conclusion upon us that this negro both hallowed and waved at appellee, just as he says he did, in an attempt to save his life in the short time that he was permitted to do so. There were several other witnesses who testified in corroboration of this negro brakeman that he was waving frantically with his hat and hand in the direction of the appellee, but these other witnesses were several hundred feet distant from the negro and appellee, and they were unable to say whether the negro in fact hallowed at appellee, as he swears he did, but from their testimony no reasonable and fair mind could conclude that the negro was not making a frantic effort to attract the attention of the appellee and to save him from death or serious bodily harm.

In support of their contention that the issue of discovered peril was in the case and was sustained by the evidence, counsel for appellee cite, among others, the Trochta Case, hereinabove mentioned. In that case it will occur at a glance that the engineer in charge of the engine which came in contact with Trochta's wagon discovered Trochta at least 100 yards before the engine reached the crossing, and realized Trochta's peril. The engineer testified that he at once, upon making such discovery, threw on the emergency brake, with the view to stopping the train so as to prevent the collision, but did not attempt to blow the whistle on the engine with which it was equipped, because, as stated by him, he could not do both—that is, blow the whistle and handle the emergency brake at the same time—and that in his judgment at the moment the best thing to do was to use the emergency brake, and thereby try to prevent the collision. The jury found that the engineer should have blown the whistle, and that he was guilty of negligence in not doing so, and that this was a proximate cause of the collision with Trochta's wagon. The Court of Civil Appeals took the view in that case that, if the engineer did what he thought was best in the emergency—that is, tried to prevent the collision by use of the emergency brake— then he would not be guilty of negligence in failing to blow the whistle, and upon such

view of the law held that the rule of discovered peril had no application. It will be readily seen that in that instance the engineer had a choice of means; that is, he could try to stop the train by the use of air brakes, or he could have attracted Trochta's attention by blowing the whistle when the engine was some 300 feet from the crossing, which might have saved Trochta. The Commission of Appeals, on the legal point involved, held that it was not for the engineer to determine what should have been done—that is, whether the emergency brake should have been used or the whistle blown, if both could not be done—but the question was what would an ordinarily prudent person, under the same or similar circumstances, situated as the engineer was, have done, and the jury found, as we have stated, that an ordinarily prudent person, situated as the engineer was, under the circumstances, would have blown the whistle. That case has no application to the facts in this case. There was nothing to do here by the negro brakeman, Dukes, except to get the attention of the appellee, if he could. He could not stop any cars, he could not, by means of anything at his command, have gotten in communication with the engineer in time so as to have invoked the assistance of the engineer in the use of the bell or whistle, and he did not have time to get down from the cars on the track west of the main line and run over and grab the appellee and save him from his peril, and all he could do was to try to attract his attention, which the undisputed testimony shows, in so far as flagging with his hat and hands, he tried to do, and his own positive testimony shows that he also hallowed as loud as he could, all of which effort on his part was unavailing; and, as we have shown above, there was no necessity, or apparent necessity, for resorting to any of these means by this brakeman until appellee had stepped upon the house track within 6 or 8 feet of the approaching cars. In addition to the Trochta Case, supra, counsel for appellee also rely upon T. & N. O. v. Scarborough, 104 S. W. 408, and 101 Tex. 436, 108 S. W. 804; M., K. & T. Ry. Co. v. Reynolds, 103 Tex. 31, 122 S. W. 531; S. A. & A. P. v. Hodges, 102 Tex. 524, 120 S. W. 848; Garza v. Railway Co., 41 S. W. 172. We have examined carefully all these cases, and, without discussing them, have reached the conclusion that neither of them is authority for the contention of counsel for appellee on the issue of discovered peril.

In T. & P. R. Co. v. Breadow, 90 Tex. 30, 36 S. W. 412, the Supreme Court, speaking through Judge Denman, announced in very clear language the doctrine of discovered peril, as applied by the courts of this state. Among other things, Judge Denman said:

"If defendant, through the parties in charge of the engine, knew of Breadow's peril in time to have avoided same, such knowledge imposed upon it the new duty of using every means then within its power, consistent with the safety of the engine, to avoid running him down, and a failure so to do would render it liable, notwithstanding he may have been guilty of contributory negligence in being exposed to the peril. This new duty and liability for its breach is imposed, upon principles of humanity and public policy, to prevent what would otherwise be, as far as civil liability is concerned, the licensed destruction of persons negligently exposing themselves to peril. The same principle of law which, on grounds of public policy, will not permit a person to recover when his own negligence has proximately contributed to the injury, will not permit the party who has inflicted the injury in violation of such new duty to defend upon the ground of such negligence."

"The principle, however, has no application in the absence of actual knowledge on the part of the person inflicting the injury of the peril of the party injured, in time to avoid the injury by the use of means and agencies then at hand. If he had no such knowledge, the new duty was not imposed, though it be clear that by the exercise of reasonable care he might have acquired same. The burden of proof was upon the plaintiff in this case, in order to recover for a breach of such new duty, to establish, not that the employés might by the exercise of reasonable care have acquired such knowledge, but that they actually possessed it."

See, also, Houston Electric Co. v. Patella, 222 S. W. 615, where other authorities discussing the doctrine are cited.

Having reached the conclusion that the appellee was guilty of contributory negligence as a matter of law, and that appellee wholly failed to sustain by proof his plea of discovered peril, no alternative is left us other than to reverse and render the judgment in this cause, and such is the order here.

Reversed and rendered.

WALKER, J., dissents.

#### On Rehearing.

PER CURIAM. Rehearing denied.

WALKER, J. (dissenting in part). I concur with my Brethren in their holding on the issue of discovered peril. But I most earnestly dissent from their holding on the issue of contributory negligence, and from their conclusion that, "inferentially," appellee "was relying upon this whistle to give him warning of the approach of any cars on that track." As I understand the facts of this record, this inference should not be drawn. As a further statement of the distractions that enter into this case, in addition to the statement made in the majority opinion, I give the following additional statement from the testimony of appellee:

"It never occurred those cars might hit me, but it did occur to me to get as far away from those cars that were passing me. They

could not hardly have hit me unless I got in front of them. Sure it occurred to me to pass away and get over and go east, to get as far away from those cars as possible; that is the natural instinct, to move away. I thought of stepping over to Mr. Hill's, but the ties were uncovered where I started to cross, and the roadbed leading in and out of his office at that place was in that shape. I glanced over my shoulder and saw these cars. If I had not seen those cars passing on my left, I would not have crossed the track where I did, but would have naturally went on farther down north and crossed over where there were no ties exposed, but, seeing these cars on passed, or part of them that had already passed me, and knowing that there was the main line between me and those cars, instinctively I crossed immediately where the ties were exposed. In crossing that track, I was watching my steps on the ties to see that I stepped properly on the ties, sorter feeling my way · from one to the other and looking in the direction of the string of cars on the left going down the other way, with my face angling to the left, which would be almost north, but a little west of north, watching the cars pass me going on down, and in that position I was feeling my way carefully across this track there and the ties were exposed, stepping from one tie to the other. I was careful, seeing where I was placing my feet so that I wouldn't stumble or fall. Going on down that track I stopped and looked to see if there were any cars coming on that other track. I turned before I stepped on the house track and looked back, and the cars were standing on this track that leads off to the left of the main line. I looked back just before I got up on the house track."

It seems to me that the facts of this case make the issue of contributory negligence one of fact, and not of law. According to appellee's testimony, less than 30 seconds after he first crossed the house track he was struck by appellant's cars. As to the care exercised by him when he first crossed this house track, he said:

"Going on down that track I stopped and looked to see if there were any cars coming on that other track. I turned before I stepped on the house track and looked back and cars were standing on this track that leads off to the left of the main line. I looked back just before I got on the house track. * * * I looked back when I started to cross the house track the first time to make sure the cars were going to stop; I looked back to see if the cars were standing on the left side of the main line and it was safe to walk across."

Where he was injured the ties were exposed and the walking was rough. Just as he stepped onto the house track in front of the approaching cars, he was watching the string of cars pass on his left. As to these matters he testified:

"In crossing that track, I was watching my steps on the ties to see that I stepped properly on the ties, sorter feeling my way from one to the other, and looking in the direction of the string of cars on the left going down

the other way, with my face angling to the left, which would be almost north, but a little west of north, watching the cars pass me going on down, and in that position I was feeling my way carefully across this track there, and the ties were exposed, stepping from one tie to the other. I was careful, seeing where I was placing my feet, so that I wouldn't stumble or fall."

Also as he stepped onto · the house track it occurred to him to cross over to Mr. Hill's office and give him the message about his milk. The care exercised by him when he crossed the house track, just a few seconds before, and the distractions he encountered, after first crossing the house track, are as strong in his favor as were the defenses against contributory negligence in the Kirksey Case reviewed in the majority opinion. After reviewing the facts of that case, the· Supreme Court said:

· "There remained for the jury the question of whether under all the. facts and circumstances, including said distractions, a reasonably prudent person, in Kirksey's situation, would or would not have done substantially as he did."

On the proposition that "distractions" are sufficient to take the issue of contributory negligence to the jury, I refer to the authorities reviewed by me in my dissenting opinion in the Roan Case, 230 S. W. 1083.

I do not construe the Edwards Case, on which the majority base their opinion, as being in point on their holding. Edwards approached the railroad without exercising any care for his own safety. The record discloses no "distractions." He rested his safety on the performance of a duty owed him by the railroad company. The Supreme Court held that he was negligent in so doing.' For, as said by the Supreme Court of the United States in Railway Co. v. Houston, 95 U. S. 697, 24 L. Ed. 542:

"One cannot require of another to take better care of him than he takes of himself."

But, as I understand the facts of this case, Barron was not looking to appellant to give him warning of the approaching cars. He did· not even have in mind that cars might be approaching him on the house track. As an explanation of this fact and of his failure to look and listen for approaching cars he offered the care exercised by him a few minutes before and the distractions that entered into the case after he first crossed' the house track.

Nor do I think this case should rest on a literal construction of the citation given in the majority opinion from the Kutack Case. In the Kirksey Case, supra, it seems that our Supreme Court clearly recognized that one could have "an unobstructed view of the railroad, so as to know of the approach of a train a sufficient time to clearly avoid any injury," yet because of "distractions" make

contributory negligence a matter of fact. The citation given in the majority opinion from the Boyd Case must be the law; at least my dissent here is based on the principle of law there announced. The difference between me and my Brethren is not on this statement of the law, but on the facts. I think the facts and circumstances of this case raise an issue as to whether or not a reasonably prudent man would have acted as appellee did.

As I construe the majority opinion, they have convicted appellee of contributory negligence, against the verdict of the jury, on their findings that he "neither looked nor listened to see whether cars may have been approaching on the house track before he left the cinder path of safety and stepped thereon," and that "he was paying no attention whatever for his own safety at the time he stepped on the house track where he was injured." I concur with them in the finding that appellee neither looked nor listened for approaching cars on the house track before he stepped thereon. But this finding does not convict him of contributory negligence as a matter of law. In this state the general rule is that the failure of one to look or listen for an approaching train before stepping onto a railroad track does not, of itself, convict him of contributory negligence as a matter of law. And as I understand these facts, this case does not come within any of the exceptions to that general rule. But the majority make the further finding that "he was paying no attention whatever for his own safety at the time he stepped upon the house track, where he was injured." If this finding was made by the majority as a literal construction of the facts in the record, I am forced to dissent therefrom. Appellee was walking down the track in the ordinary manner, stepping carefully on exposed ties, avoiding stumbling, and, but for the danger from the approaching cars, certainly in the exercise of ordinary care; that is, walking as an ordinarily prudent man would have walked under the same or similar circumstances. Doubtless the majority of the court had in mind in this finding that appellee stepped onto the house track without paying any attention for his own safety in regard to cars approaching on that track. Such a finding is sustained by this record. At the time he stepped onto this house track, if a duty rested on him to have in mind the fact that cars might be approaching him, then he was not in the exercise of ordinary care, for he did not have that fact in mind. But the majority opinion recognizes that he was under no such absolute duty, for they say:

"Had the presence of these cars west of the main line and their discovery by appellee afforded any reason on his part to apprehend any danger to himself, and therefore his attention for the moment was upon these cars,

there would be sound reason for the contention that, appellee's attention being thus claimed, he might have been excused from having failed to look or listen for the approaching cars on the house track which caused the injury, but appellee admitted expressly that he knew he was in no danger by reason of the presence of these four cars west of the main line, and well knew that the cinder path between the house track and the main line, which he was then traveling, was a perfectly safe place for him to be, notwithstanding the presence of these four cars west of the main line, and his only reason for fixing his attention upon these four cars was that it was 'natural instinct' for him to bear them in mind and avoid them as far as he could."

Thus they recognize that a distraction growing out of one danger may excuse one for incurring another danger. In their argument on this point have my brethren drawn a sound distinction? Is it a sound legal proposition to say that only those distractions which threaten danger are sufficient to make an issue against contributory negligence? It seems to me that the rule should be that an issue is made against contributory negligence when distractions are in the case sufficient to hold the attention of a man of ordinary care and cause him to enter a place of danger without having in mind the possibility of being injured. Our books are full of cases, in addition to those reviewed by the majority, where one has approached a railroad crossing without looking or listening or paying attention for his own safety, in regard to approaching cars, and yet verdicts finding against contributory negligence have been affirmed. Possibly the best-known cases of this character rest on obscured crossings. An obscured crossing is not less dangerous than one with an open view—rather, it would seem, more dangerous. Yet the obstructions have excused travelers from stopping or looking or listening or paying attention for their own safety. It must be on the proposition that such obstructions so distracted the attention from the approaching danger as to make contributory negligence an issue of fact. But we have judicial authority for other distractions besides obscured crossings. Many of these are reviewed by me in the Roan Case, supra. So, while I agree with my Brethren that Barron stepped in front of the approaching cars without looking or listening or paying any attention for his own safety in regard to the approaching cars, yet, as he was not aware of his danger, and did not have the approaching cars in mind, and as his attention was fixed on and held by the other facts and circumstances which I have discussed, his failure to do the things found against him by the majority of this court did not make him guilty of contributory negligence as a matter of law.

As I understand the facts of this case, if

an ordinarily prudent man, before stepping onto the house tracks, under all the facts and circumstances, including the "distractions," would have looked or listened or paid attention for his own safety—that is, had in mind that cars might be approaching him on the house track—then appellee was guilty of contributory negligence. But, if an ordinarily prudent man would not have looked or listened or paid attention for his own safety—that is, had in mind that cars might be approaching him on the house track—before he stepped onto the house track, he was not guilty of contributory negligence. This was for the jury, and they have answered the issue in appellee's favor. In my judgment this motion for rehearing should be granted, and the judgment of the trial court affirmed. But the majority of the court do not agree with me, and it is their order that the motion for rehearing be in all things overruled.