## SAN ANTONIO & A. P. RY. CO. v. SINGLETARY. (No. 6895.)*

(Court of Civil Appeals of Texas. San Antonio. March 14, 1923. Rehearing Denied April 18, 1923.)

**1. Railroads ☞301—Train has precedence over automobile at crossing.**

Common sense and the public welfare dictate that the right of precedence as between a train and an automobile approaching a crossing should be accorded to the train.

**2. Railroads ☞324(1)—Track warning of danger.**

A railroad track is a proclamation of danger, imposing on travelers the positive duty of using care to avoid trains.

**3. Railroads ☞324(2) — Statutory regulation of speed of automobiles applicable where view of train is obscured.**

Acts 1917, c. 207, § 17 (Vernon's Ann. Pen. Code Supp. 1918, art. 820l), requiring automobilists to reduce their speed to six miles an hour when approaching obscured crossings at which there are no gates or flagmen, applies where the driver's view of a train approaching the crossing is obscured, as well as where his view of the crossing itself is obscured.

**4. Railroads ☞325(2)—Traveler with defective hearing or sight must use additional precautions.**

Defects in hearing or sight require one approaching a railroad crossing to exercise additional precautions in proportion to his handicaps.

**5. Railroads ☞328(1)—Traveler must approach crossing with care where view is obstructed.**

The presence of obstacles concealing an approaching train requires the traveler to approach the crossing with extraordinary care.

**6. Railroads ☞328(7)—Noise of automobile requires occupants to slow up at crossing.**

The noise of an automobile emphasizes the duty of its occupants to slow up on approaching an obscured crossing so as to be certain that they can hear an approaching train above the noise of their own vehicle.

**7. Railroads ☞324(3)—Automobile driver going on crossing without reducing speed held negligent.**

An automobile driver approaching a railroad crossing about 50 feet away, at a speed of about 20 miles an hour, who went on the track without slowing down, in violation of Acts 1917, c. 207, § 17 (Vernon's Ann. Pen. Code Supp. 1918, art. 820l), though he could have stopped the car within 30 feet, *held* guilty of contributory negligence precluding recovery for death from injury by a train running about 35 miles an hour and giving signal of its approach by sounding the whistle at the whistling board 500 yards from the crossing and ringing the bell from the board to the crossing.

**8. Railroads ☞338—Company held not liable under discovered peril doctrine for automobile driver's death.**

A railroad company *held* not liable, under the doctrine of discovered peril, for the death of an automobile driver going about 20 miles an hour when struck by a train approaching on a down grade at a speed of 35 miles an hour on a track paralleling the highway connecting with a crossroad; it appearing that the engineer sounded the whistle when the train was 500 yards from the crossing, and that the fireman was engaged in his statutory duty of ringing the bell from the time he saw the automobile until it turned toward the track, when he warned the engineer, who immediately applied the emergency brakes when the train was 100 feet away.

Appeal from District Court, Karnes County; Covey C. Thomas, Judge.

Action by Mrs. Nicy B. Singletary against the San Antonio & Aransas Pass Railway Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Boyle, Ezell & Grover, of San Antonio, Bell & Brown, of Karnes City, and Proctor, Vandenberge, Crain & Mitchell, of Victoria, for appellant.

Thames & Scarborough, of Kenedy, Doss & Baugh, of Ballinger, and Hal Browne, of San Antonio, for appellee.

SMITH, J. The appeal is from a judgment against the railway company in favor of Mrs. Singletary for damages occasioned to her by the death of her son, D. H. Singletary, in a crossing accident near Kenedy, in Karnes county, on September 2, 1920 at 4:40 p. m. The amount of the verdict and judgment was $7,000.

The deceased had undertaken for another to drive a Ford automobile from San Benito, in Cameron county, to Ballinger, in Runnels county. Somewhere en route he had picked up D. A. Nugent, who was in the car with him at the time of the accident. Both were instantly killed. The accident was witnessed by no one except the fireman on the locomotive which collided with the automobile. The only testimony in the case bearing on the question of speed was that the automobile was running 20 or 25, and the train 35 or 40, miles an hour. The collision occurred at a public crossing. The train was moving

---

north, as was the automobile, until it turned sharply east and undertook the crossing.

The public road parallels the railway for a mile or more before turning at right angles across the tracks. These tracks are 50 feet from the public road, which is 50 feet wide. If the car traveled along the center of the highway, it would thus be 75 feet from the railway tracks. The highway paralleling the railway turned sharply both to the right and to the left opposite the place of the accident, so that one traveling north on this highway, as deceased was, could turn to the east or to the west according to his choice. If he turned west, he left the railway behind him. Turning east, as in this instance, he would cross the railway 50 feet east of the turn. The sharp turn of this road is heralded to the approaching traveler by a large advertising sign, spread squarely across the way.

The whistling board was some 500 or 600 yards south of the crossing. The undisputed testimony shows, and the jury found, that the locomotive whistle was sounded at this board, and the undisputed testimony shows, although there was no jury finding thereon, that the locomotive bell was rung continuously from this board to the crossing. When this whistle was sounded the travelers were somewhere on the public road 50 or 75 feet from the railway tracks, and between the train and the crossing, and while, of course, there was no testimony that the travelers heard or did not hear the whistle, it was conclusively shown that it was heard by a number of persons, some of them as much as three-quarters of a mile up the tracks, and hence almost directly in line with and beyond the travelers.

The jury found that appellant permitted the weeds to be in its right of way to such an extent that the deceased could not in the exercise of ordinary care see the approach of the train "in time for the collision to have been avoided"; that the train was running at an excessive rate of speed; that, although the train operatives sounded the whistle for the crossing as required by the statutes, they "failed to give such warnings of the approach of the train as a person using ordinary care would have done"; that these acts or omissions constituted negligence, and each caused or proximately contributed to cause the accident.

The jury further found that before going upon the crossing the deceased looked, listened, and "did every other act for the purpose of discovering whether or not a train was approaching said crossing." There was no evidence, however, to support these findings. Both occupants of the automobile were instantly killed in the accident as stated, and thus their lips were sealed. No one saw the automobile or its occupants prior to the collision, except the fireman on the locomotive, and it is from his evidence alone that any inference may be drawn or finding made. This witness testified that he first saw the automobile about the time the train passed the whistling board, and the whistle sounded; that at that time the car was ahead of the train, moving along the public road paralleling the railroad at about 25 miles an hour; that it continued at about the same speed until it reached the crossroads, when it turned to the east at about 20 miles an hour, and, without checking its speed, moved towards and upon the crossing, immediately in front of the on-coming train. This constitutes the whole of the evidence relating to the conduct of the occupants of the automobile prior to the accident. To this evidence alone could the jury look in reaching its finding thereon. Certainly it did not in any event warrant the finding actually returned. If the jury were warranted in reaching any conclusion, or drawing any inference, from this evidence, it is the conclusion or inference that, whether the occupants of the car saw the train or not, they heard the whistle when it was sounded a few hundred feet away so loudly that it was heard by half a dozen others three-quarters of a mile beyond, and in almost a direct line with them; that, instead of slackening, they continued to maintain the rate of speed at which they were traveling, and, in disregard of the obvious danger, undertook to "beat" the train to the crossing. Such attempts are not unknown among automobile drivers. It is no less a matter of common knowledge that such attempts are undertaken than that they are sometimes unsuccessful.

[1] The train operatives and the occupants of the automobile, of course, had an equal right to the use of the crossing, subject to the duty resting upon each to so exercise the right as not to unreasonably interfere with the other's use of it, and to exercise due care to avoid injuring the other. These duties of automobilists and railway operatives, are reciprocal, and rest equally upon both, although, since both cannot pass an intersection at the same time, one or the other must have the right of precedence, which common sense and the public welfare dictate should be accorded to railway trains. This is the general rule, recognized and accorded by the public. Huddy on Automobiles, § 556; Baker v. Collins (Tex. Civ. App.) 199 S. W. 519.

[2] A railroad track is of itself a proclamation of danger, imposing upon the traveler at the railroad crossing a positive duty of using care to avoid trains. In approaching such crossing it is his duty to assume a present danger, which includes the immediate approach of a train within a dangerous distance, and "the man who, knowing it to be a railroad crossing, approaches it, is careless unless he approaches it as if it were

dangerous."¹ Huddy, § 550. The traveler is charged with notice of this danger, which is being impressed more and more upon the public mind·by constantly recurring tragedies such as this. The Legislature of Texas long since recognized this danger by enacting a statute requiring train operatives to signal their approach to crossings by both bell and whistle, and the courts are, and ought to be, strict in penalizing the railroads for failure to comply with this statute. Since the advent of automobiles, and prompted no doubt by the resulting alarming increase of crossing accidents, the Legislature enacted a statute in 1917 (chapter 207, § 17 [Vernon's Ann. Pen. Code Supp. 1918, art. 820*l*]) imposing a reciprocal duty upon the automobilist by requiring him upon approaching, and at not less than 30 feet from, a railroad crossing the view of which is "either wholly or partially obscured," to reduce the speed of his automobile "to a speed not to exceed six miles per hour before making the said crossing." If both the railway operative and the automobile driver would in all cases comply with these statutory requirements, such tragedies as the one involved would never occur. These requirements are of equal dignity; they create reciprocal obligations equally binding upon both parties, against ·each of whom those obligations should be enforced with equal vigor to the end that human life be not held so.cheaply in this state.

[3] Appellee contends that the act of 1917 requiring the automobile driver to reduce the speed of his car to six miles an hour when approaching obscured crossings does not apply in this case. She contends that the act applies only in cases where the driver's view of the actual place of crossing the railway tracks is obscured, and that it does not apply in cases, such as this, where the driver's view of approaching trains is obscured; that the act relates to the view the driver may have of that part of the public highway occupied by the railway tracks, and does not apply to the driver's view of the tracks and right of way on each side of and as they approach the public roads or of trains as they approach the highway. The statutory provision is that:

"Art. 820*l*. Duties as to Crossing of Railroad Tracks.—Any person driving a motor vehicle * * * when approaching the intersection of a public * * * highway with the tracks of a steam railroad * * * where such * * * highway crosses such track or tracks at grade, and where the view of the said crossing is obscured, either wholly or partially, shall before attempting to make the said crossing, and at some point not nearer than thirty feet of the said track, reduce the speed of his motor vehicle or motorcycle to a speed not to exceed six miles per hour before making the said crossing, unless there are flagmen or gates at such crossing and such flagmen or gates show that the way is clear and safe to cross such track or tracks. * * *"

Appellee in support of this contention cites Schaff v. Bearden, 211 S. W. 503, and it seems in that case the Court of Civil Appeals of the Fifth District has so held. But the contrary is decided in the case of Railway v. Harrington, 209 S. W. 685, by the court in the Ninth district. In the latter case writ of error was granted, and the judgment of the Court of Civil Appeals reversed by the Commission of Appeals (235 S. W. 188), which, however, declined to decide the question of the applicability of the statute to such cases. Whether it accomplishes that purpose or not, it was the obvious intention of the Legislature in enacting the statute to require the automobile driver. to slow up when attempting crossings at which the view of on-coming trains is obscured. To construe the act to apply only in cases where the driver's view of the mere crossing itself, and not of trains approaching the crossing, is obscured, would in our opinion render the act ridiculous, and give it an effect quite beside the legislative intention. It would, among other incongruities, penalize a driver for failing to slow up at a crossing of which his view is "wholly obscured"; that is, which he could not see, and which, because of its obscurity, he could not know was in existence until he had passed through and beyond the obscurity, and accomplished the very act prohibited. It will be observed that the reduction of speed is required only when there are no crossing gates or flagmen "to show that the way is clear and safe to cross such track or tracks," from which it must be inferred that the reduction of speed is designed to accomplish the same purpose that gates or flagmen would accomplish. Of course, it is a matter of common knowledge that gates and flagmen are placed at railroad crossings for the sole purpose of protecting travelers from passing trains. They are not placed there to protect travelers from defects in the crossing, or from dangers that lurk in the railway tracks as such. The dangers to the travelers at intersections of public highways and railroads are from trains, and not from the simple act of driving over the tracks. It is these dangers that the act in question seeks to minimize. The efficiently operated crossing gate or the properly attentive crossing flagman serves the same purpose. But these safeguards are used only at crossings on the principal streets of populous towns and cities, leaving all the other highways used by the traveling public without that character of protection, and the act in question was obviously designed to give this protection to travelers at such highway crossings. Of course, if the phrase "where the view of said crossing is obscured" is considered alone, it may warrant the construction sought to be applied by appellee, but when the article is considered as a whole, as it must be, the broader construction is authorized, and the suggested absurdity

avoided. While appellee suggests in her brief that appellant's pleading setting up this statute was stricken out on exception, the order thereon is not pointed out by any record reference, is not indicated in the index to the transcript, and is not disclosed by our examination of the transcript, and we must therefore assume that such order was not entered in the record.

[4] The caution required of the traveler in approaching railroad tracks varies according to the peculiar circumstances surrounding him, and, the greater the difficulty of seeing and hearing an approaching train as it nears a crossing, the greater caution the law imposes upon him. If his hearing or sight is defective, or if in a noisy or obscured environment, his means of ascertaining the dangers of his situation are less than those of one whose hearing and eyesight and environment are normal. But these defects do not excuse him; on the contrary, they enhance and emphasize his duty, and require him to exercise additional precautions in proportion to his handicaps, the rule in Texas being that "the less ability one has to discover approaching danger the more careful he should be in going within its reach." Railway v. Ryon, 80 Tex. 59, 15 S. W. 588; Railway v. Dean, 76 Tex. 73, 13 S. W. 45; Railway v. Kauffmann, 46 Tex. Civ. App. 72, 101 S. W. 817; Railway v. Price (Tex. Com. App.) 240 S. W. 524; Railway v. Wyatt, 35 Tex. Civ. App. 119, 79 S. W. 349.

[5, 6] So, if defective sight or hearing imposes upon the traveler the duty to exercise extraordinary precautions in approaching a dangerous crossing, then certainly the presence of obstructions which would conceal an approaching train would for the very same reasons require him to approach such crossing with extraordinary care. And so for like reason, should the noise and rattle of an automobile emphasize the duty of its occupants to slow up so as to be certain they could hear an approaching train above the noise of their own vehicle. We make this last observation in response to appellee's testimony and argument that the deceased was traveling in a Ford car, the noise of which would lessen his ability to hear the signals and rumble of the train which struck him.

The rule that the traveler should increase his caution where obstructions interrupt his view of a crossing is forcefully recognized by the legislative provision requiring him to check his speed to 6 miles an hour as he approaches, and 30 or more feet from, an obscured crossing. The provision does not apply at open crossings, as will be seen; it applies only at crossings when the view is "wholly or partially" obstructed. This distinction is based, of course, upon the fact that the dangers are concealed at the obstructed crossing, and are obvious at the open crossing. The obstruction, instead of being

a trap for him, is a danger signal to him. He cannot see whether or not a moving train is about to use the crossing; he may or he may not be able to hear it, depending somewhat upon the noise his own vehicle is making; he is in the dark for all the practical purposes of his undertaking, and knows nothing except that running across his path are railroad tracks on which he must assume a train is about to pass. It is in this peculiar situation that the Legislature, as well as common sense and a normal regard for his own safety, puts upon him the duty to reduce his speed until he reaches a clear view that will enable him to ascertain whether or not he can safely continue across.

"Where the obstruction continues comparatively close to the track, the operator of the machine should have his car under such control and running at such speed so that, if he sees a train, he can stop his car to avoid a collision. * * * If the obstructions continue so close to the track that the traveler cannot look effectively until he is in a place where he will be struck by the train, reasonable care would seem to require that he stop his machine previously and listen." Huddy, § 559.

[7] If the statutory requirement, or the precautions prescribed in the foregoing rules, had been observed by the deceased in this case, it becomes a matter of course that the accident would not have occurred. Even if he had not theretofore been aware that he was approaching a railroad crossing, he necessarily realized it when he turned east and saw it lying before him between 50 and 75 feet away. The undisputed testimony is that he turned this corner at the rate of about 20 miles an hour, and that even at that speed he could have brought his car to a full stop within 30 feet, which would have left him from 20 to 40 feet in the clear; whereas as little as one inch would have saved him.

We are of the opinion that the facts establish the contributory negligence of the deceased. If, as appellee contends, the right of way was so obstructed, and the noise made by his own car so great, that deceased did not and could not see or hear the approaching train until he was within a few feet of the tracks, then he disregarded not only the statute, but every duty imposed upon him under such conditions, when he rushed in front of the train at a steadily sustained speed of 20 or 25 miles an hour. He knew the crossing was before him, and knew it in ample time to check his speed, and to come to a full stop, if that were necessary to enable him to ascertain the true situation. But he failed to do either. If, upon turning east and observing the crossing 50 or 75 feet ahead of him, the view was obstructed, he should have checked his speed until he obtained a view, conforming his speed and control to the proximity of the tracks. If his car, going at 20 or 25 miles an hour, made

so much noise that he could not hear an approaching train, he should have checked his speed until he could hear, still keeping the proximity of the tracks in mind. He took none of these precautions, but, in total disregard of the danger of which he was charged by law with notice, rushed into that danger. It was said by the Commission of Appeals in Railway v. Gaddis, 208 S. W. 895, and reiterated by the same court in Railway v. Price, 240 S. W. 524:

"All men in possession of their faculties are charged with knowledge that a railroad track is a dangerous place, and the law will not permit them to go upon the track, even at a public highway, without being charged with a recognition of the danger attending such action and the use of such care as ordinary prudence would dictate in so doing. *Where no care whatever has been exercised, our courts uniformly hold that contributory negligence exists as a matter of law, and recovery is denied.*" (Italics ours.)

[8] If we are correct in holding, as we have done, that the deceased was as a matter of law guilty of contributory negligence, then appellee could not recover unless she was entitled to do so under the doctrine of discovered peril, which was urged in the court below and presented in this court. In our opinion, however, the issue of discovered peril is not shown to have arisen in the case. In the first place, under appellee's theory the right of way was so obstructed that the train could not be seen by deceased until he was almost upon the tracks, and, as the railway and public road were upon the same level, it follows as a matter of course that the same obstruction would automatically prevent the train operatives from seeing deceased's automobile until it was practically upon the tracks, and, it being the undisputed testimony of appellant's as well as appellee's witnesses that the train approached the crossing on a down grade at a speed of 35 or 40 miles an hour, it likewise follows as a matter of course, and all the evidence conclusively showed, that in such a situation no power in defendant's hands could avoid the accident after the deceased had reached the point of view insisted upon by appellee. On the other hand, if we are to look to the testimony for evidence of discovered peril, we must look alone to the testimony of the fireman of the locomotive, who was the only witness who professed to see the deceased's automobile before the collision, and of the engineer. The fireman testified that he first saw the automobile when the train was back at the whistling board, 500 or 600 yards before the crossing was reached, and observed it as it moved along the highway paralleling the railroad, and that he did not suspect that the deceased would turn east, instead of west, and run in front of the approaching train. The whistle had been sounded for the crossing at the usual place; the bell was being rung, as it

was until the accident occurred; the train was running precisely on its schedule time. But, when the automobile took the east instead of the west turn of the road and started towards the crossing at a speed of 20 or 25 miles an hour, the fireman suspected danger, and called out to the engineer, on the opposite side of the engine cab, to "look out," that the engineer immediately applied the emergency brakes, but that it was impossible within the short distance, which was only 100 feet, to stop the train, or do anything whatever to avoid the accident. The engineer could not see the automobile because of his position on the opposite side of the engine. He did not even know what the trouble was and knew nothing of the true situation, but when the fireman called out he instinctively applied the emergency brakes. This application, however, and as a matter of course, could have had no appreciable influence upon the speed of the train by the time the collision occurred two or three seconds later. Within this short time, and distance, with the two machines converging, one at 35 or 40 and the other at 20 or 25 miles an hour, it is impossible for the mind to conceive of a means in appellant's hands of averting the accident and the undisputed testimony so showed. As was said by the Supreme Court in Railway v. Dean, 76 Tex. 73, 13 S. W. 45:

"There is nothing in the record to indicate that, after it became evident that he was going to place himself in a position of danger, it would have been possible for the defendant, by the use of any degree of skill or watchfulness, or by the use of any known appliances, to have stopped the cars in time to have saved him."

Appellee contends that the fireman, when he saw the deceased turn into the crossing, should have sounded the whistle to attract the attention of deceased, and that this might have prevented the accident. But there is nothing in the record to support this contention. In the first place, the evidence was that the whistle cord was, as usual, on the engineer's side of the cab, and manipulated by the engineer, and not by the fireman. The fireman was engaged in the duty, peculiarly his, of ringing the bell, which was on this occasion required by statute. In order for the fireman to sound the whistle, it would have been necessary for him, in disregard of the statute, to cease ringing the bell, leave his seat, pass across to the engineer's side, a distance of several feet, and get hold of and pull the whistle cord, or lever, or whatever the whistle is manipulated with. If this could have been reasonably expected of the fireman, it was rendered impossible of performance here for the reason that the collision occurred within about two seconds from the time of the discovery of the traveler's peril, and it is inconceivable, and there is no evidence to warrant a conjecture,

that this course could have possibly prevented the collision.

These two witnesses, the fireman and engineer, alone testified to the facts relating to discovered peril, and the issue must be determined alone from that evidence. If it is disregarded, then there was no evidence upon the question; if it is considered, then it forecloses the issue against appellee. The burden of proof was upon appellee as plaintiff below to prove a case of discovered peril, which defense alone could have been available to her in view of the contributory negligence of the deceased. As was said by the Supreme Court of Texas in Morgan v. Railway, 108 Tex. 334, 193 S. W. 134, and reiterated by the same court in Railway v. Watts, 110 Tex. 106, 216 S. W. 391: ·

"With us the doctrine [of discovered peril] defeats contributory negligence on the part of the plaintiff only when the danger arising therefrom is imminent, is actually discovered by the defendant, and may be averted by the means at the latter's command."

Here the plaintiff not only failed to meet this burden, but the undisputed testimony affirmatively showed that, when defendant's train operatives actually discovered the deceased's peril, it was a physical impossibility for them to do anything whatever to avert the collision. The law is well settled in this state, not only by the decisions cited, but by many others, among which are Houston & T. C. Ry. Co. v. Smith, 77 Tex. 179, 13 S. W. 972; Railway v. Breadow, 90 Tex. 26, 36 S. W. 410; Railway v. Shetter, 94 Tex. 199, 59 S. W. 533; Railway v. Staggs, 90 Tex. 458, 39 S. W. 295; Baker v. Loftin (Tex. Com. App.) 222 S. W. 195.

The fact that the fireman saw the deceased driving along the highway paralleling the railway near by, and knew that the highway turned east and west at the crossing and that, if the deceased turned east, the road would lead him across the railway tracks, did not serve, as appellee contends, to apprise the fireman of any danger to the traveler, and imposed no new duty whatever upon the train operatives, who had just given the statutory signals, and were even then ringing, and continued to ring, the bell in compliance with the statute. As was cited by Justice Brown in Railway v. O'Donnell 99 Tex. 636, 92 S. W. 409:

"If O'Donnell [the traveler] was negligent, to render the railroad company liable, the evidence must show that O'Donnell was in a place of danger when seen by the employees, that the man in charge of the engine saw him and realized that he was in a dangerous position, and also that he either could not or would not probably extricate himself from the dangerous situation, or that O'Donnell would probably put himself in danger. * * * Trainmen are not bound to assume that a person not on the track will get on it, where it would be negligent and dangerous for him to do so; and, as

they would not be bound to assume it, a jury could not properly find that they knew it would be done, in the absence of proof of knowledge." Railway v. Shetter, 94 Tex. 199, 59 S. W. 533; Sanches v. Railway, 88 Tex. 119, 30 S. W. 431.

The duty of using all the means at hand to avert the collision rests with equal weight upon the operatives of both machines. The railway train approached the crossing at its usual rate of speed at that point. It was running precisely on its schedule time, and had been for some hours. It had given all the signals exacted of it by the statute in such cases. On the other hand, the deceased approached the crossing in direct violation of the statute, in that, instead of reducing the speed of his car to 6 miles an hour when 30 feet or more from the crossing, he maintained a steady rate of 20 or 25 miles an hour until his car reached and was knocked from the railroad tracks. One of the actors, then was within, while the other was clearly without, the statute law. So in this attitude the respective parties approached the crossing. The passenger train, about 300 feet long, was heavy and cumbersome. It was confined to fixed tracks, from which it would not deviate. It could not be stopped quickly, of course, nor within a distance of less than several hundred feet. On the other hand, deceased was traveling in a Ford car at 20 or 25 miles an hour. The use of the Ford is so nearly universal that its characteristic qualities have become matters of common knowledge. It is a light car, and is possessed of such agility as to excite the admiration, no less than the anger sometimes, of those who behold its antics. It can start, stop, back up, or turn out, or about or over, almost within the twinkling of an eye. It does not perforce run on fixed rails, nor does it require even a well-beaten path in which to move. It heeds not the ruts, halts not at ditches, and has been known in emergencies to negotiate fences even. In fact, it is in evidence here that it sometimes successfully dodges passing trains by suddenly changing its course into the right of way fence. When the deceased turned his car east and was confronted with the crossing, it was 50 to 75 feet away from the railroad tracks. The train was about 100 feet away. The undisputed testimony is that the train, heavy and cumbersome, and running down hill at 35 or 40 miles an hour, could not be stopped or its speed checked within that distance. On the other hand, the undisputed testimony was that the Ford car, going 20 miles an hour, could have been brought to a full stop within less than 30 feet, and that, even if its speed had not been checked, it could at the last moment have been turned off the highway, or into the right of way fence, as is sometimes done in such emergencies. Summarized, then, the undisputed evidence is that the train operatives complied with the

statute in approaching the crossing, and, when they discovered the peril of the deceased, were utterly helpless to avert the collision with the means at their command; whereas, on the other hand, the deceased approached the crossing in direct violation of the statute, and, although given ample means with which to avoid the accident, made no use of any of such means. , These uncontroverted facts, in our opinion, based on the authorities, establish the contributory negligence of the deceased, and at the same time eliminate from the case the doctrine of discovered peril.

We think there was no evidence to support the verdict, and that the court should have granted a new trial. Railway v. Bracken, 59 Tex. 71; Railway v. Kutac, 72 Tex. 643, 11 S. W. 127.

The judgment is reversed, and the cause remanded.

### On Motion for Rehearing.

It should be said that it was not our purpose in the original opinion to declare valid the act of 1917, requiring automobile drivers to reduce speed when approaching obscured railroad crossings. The question of the validity of that act was not raised, was not intended by us to be passed upon, nor was the holding that the deceased was guilty of contributory negligence as a matter of law based upon the validity or operation of the act. We simply hold that the intention of the Legislature in passing the act was obviously to require the automobile driver to reduce speed when nearing crossings at which the driver's view of approaching trains was obscured; that the obvious purpose was to give the traveler the same character of protection assured him by crossing gates and crossing flagmen, where those instrumentalities are employed. It should be said, further, that the act of 1917 was cited in the original opinion, not for the purpose of holding that the deceased was guilty of contributory negligence as a matter of law because he violated the provisions of that act, but for the purpose of emphasizing the policy and the rule requiring drivers to take extraordinary precautions in nearing crossings where their means of ascertaining whether or not trains are approaching are lessened by obstructions. The conclusion that the deceased was guilty of contributory negligence as a matter of law was arrived at from the physical facts in connection with the undisputed testimony presented in the record, and independent of the act of 1917, the consideration of which serves only to emphasize that negligence.

In connection with the question of contributory negligence, appellee in her motion cites, quotes from, and strongly relies upon the case of I. D. Barron v. H. E. & W. T. Ry. Co., 249 S. W. 825, recently decided by Section B of the Commission of Appeals, in an able and thoroughly interesting opinion written by Judge Powell, from which Presiding Judge McClendon dissented. The case went up on writ of error to the Beaumont Court of Civil Appeals (235 S. W. 335). But we do not regard our disposition of that question in this case as in any sense in conflict with the decision in the Barron Case. In the latter case Barron, a pedestrian, was working his way through a somewhat complicated situation, and while taking care to avoid danger on one track was struck when he stepped upon another track near by, and a majority of the Commission of Appeals, according to a copy of their opinion furnished us by appellee, held that in this peculiar situation the facts raised the issue of contributory negligence, to be determined by the jury. In the instant case there were no complications in deceased's situation; there was nothing to distract his attention; nor was there any evidence of any object or occurrence which could have rendered his situation in the least uncertain, or that could possibly have interfered with the sane, normal use of his judgment and faculties. The crossing was situated in a sparsely settled locality. There was only one railroad track, within 50 to 75 feet of which he had been traveling for a distance of more than a mile before he undertook to cross it, and yet in approaching and going upon the crossing he was not shown to have done one single act to ascertain if a train was approaching, or to avoid a collision with the train when it did approach. Or, as was said by the Commission of Appeals in Railway v. Price, 240 S. W. 525, and reiterated by the same court in the Barron Case, supra, the deceased drove onto the crossing in front of the approaching train, "under circumstances which present no excuse for his not discovering it." We regard the opinion in the Barron Case as definite authority in support of the disposition we have made of this case.

The motion is overruled.