### GULF, C. & S. F. RY. CO. v. BURCH.
### No. 3782.

Court of Civil Appeals of Texas. Beaumont.
April 11, 1941.

Rehearing Denied May 7, 1941.

Terry, Cavin & Mills, of Galveston, and Robert H. Park and C. T. Duff, both of Beaumont, for appellant.

J. R. Beck, of Beaumont, and Adams & Hillin, of Jasper, for appellee.

O'QUINN, Justice.

On the 7th day of August, 1937, near midnight, in the town of Silsbee, appellee, T. V. Burch, drove his motorcycle into the side of a freight train of Gulf, Colorado & Santa Fe Railway Company, as it moved over the crossing of appellant's tracks and the public highway leading from Silsbee to Beaumont. This suit was instituted by appellee to recover damages for the injuries suffered by him in the collision. On trial to the jury, answering special issues, appellant was convicted of negligence proximately causing the accident, in the following respects: (a) The crossing in issue was more than ordinarily dangerous as a night time crossing. That appellant knew of the conditions surrounding the crossing, and in the exercise of ordinary care should have known of the condition surrounding the crossing. (b) The failure of appellant to maintain a permanent watchman, to give people approaching from the north warning, was negligence. (c) The failure of appellant to maintain an electric or automatic light was negligence. Appellee was acquitted of contributory negligence, and all other defensive issues were found in appellee's favor. Judgment was for appellee for the damages assessed by the jury in the sum of $7,910, from which appellant has prosecuted its appeal to this court.

It is our conclusion that appellee, as a matter of law, was guilty of contributory negligence in driving his motorcycle into the side of appellant's freight train, and that, on this ground, the court erred in overruling appellant's motion to instruct a verdict in its favor. The facts are as follows:

(1) Condition of appellant's tracks. Appellant maintains three tracks at the crossing in issue, running parallel; the main track, one switch track sixty feet north of the main track, and a switch track south of the main track. The highway. The principal street in the town of Silsbee runs north from the crossing in a straight line several hundred yards; it crosses ap-

pellant's three tracks at right angles. The highway has a hard surface twenty-four feet wide, and its right-of-way at the crossing is seventy-six feet wide. The highway between the switch track on the north and the main track is hard surfaced, with holes in it covered with loose sand, shell and gravel, but the holes in no way interfere with the traffic and do not constitute a hazard at the tracks. The highway approach to the railroad track, the main line, on which the train was moving, was lower than the railroad track, the difference in elevation being as follows: At two hundred feet from the crossing the highway is 2.1 feet lower, at one hundred feet 1.10 feet lower, and at fifty feet the difference in elevation is only six inches.

(2) Traffic on the highway at the time appellee was injured. The accident occurred near midnight. Appellant's freight train was moving west over the crossing. Two automobiles were parked at the crossing waiting for the train to clear the crossing. (If this fact was controverted by appellee's testimony, we say on the testimony as a whole, that it was clearly established beyond all reasonable doubt.) As appellee drove his motorcycle towards the freight train, there was no obstruction at any time between him and the train. The weather conditions did not interfere with the view of one driving towards the train. Appellant had installed on its right-of-way, in close proximity to the main line track crossing, an electric light which was burning.

(3) The facts of the collision. The following eyewitnesses of the accident testified: Claude Gambrel, employed by the United States government as a livestock inspector; Robert Dixon, appellee's friend and riding his motorcycle behind appellee; Perry Tucker, appellee's friend and riding his motorcycle behind appellee; E. L. Williford, deputy sheriff of Hardin County; appellee, T. V. Burch. Appellee was well acquainted with the railroad crossing and the condition of the highway at the crossing. We give the following summary of appellee's testimony: In substance it was that as he approached the crossing he did not discover a train on the track until he was on the first track, that is, the switch track which was some sixty feet from the main line track; that in attempting to stop he put on his brakes, but was unable to stop until he was in close proximity to the train; that the step of one of the cars caught his motorcycle and threw him under the train; that when he stopped he thought he was in the clear, but was not; that he put his feet on the ground and was in the act of backing the motorcycle back when he was struck by the train. He denied that there were any automobiles standing on the approach to the crossing waiting for the train to clear. That as he went down the street he was going between 12 or 15 miles an hour; that his two companions, Tucker and Dixon, were following behind him, all three of them riding motorcycles; that he did not turn either to the right or left, giving as an excuse his fear that his motorcycle would skid and throw him under the train; that he stopped in the clear of the train, and then for some reason his motorcycle moved forward throwing him into the train. He denied making any statement to the doctors who attended him as to how the accident occurred.

Claude Gambrel, Federal livestock inspector, testified in substance that starting home that night, and using the same crossing in order to get home that Burch later on used, he found that when he approached the crossing same was blocked by a freight train; that a car had already stopped north of the moving freight train so he stopped his car on what they called the house track or switch track north of the main line track; that both his automobile and the automobile ahead of him were headed south; that when he drove up there the engine had passed moving west and was beyond his range of vision. He then told how, after having stopped there, two motorcycles came up and passed him on his left. He did not see the third motorcycle; that one of these motorcycles passed the other and went up and stopped close to the train; that both motorcycles stopped ahead of him; that the motorcycle which stopped closest to the train, shortly after it stopped (he estimated 5 or 10 seconds) the motorcycle roared and lunged forward, and the boy on the second motorcycle jumped off and ran up toward the train; that when this motorcycle first stopped it was in the clear of the train; that there was sufficient space for the train to move forward without striking it and that the motorcycle did move forward; that he did not know what caused the motorcycle to go forward. He reiterated his being positive that the boy on the motorcycle stopped same before he went underneath the train; and that he could see him from where he was sitting. He said that he did not know Mr. Burch,

and as far as he knew he had never seen him before the accident. He said the first automobile parked was almost directly in front of him between the switch track and the main line track; that he was about on the switch track; that Burch was parked almost directly in front of him so he couldn't tell just how far away from the train he (Burch) was, but he was far enough away from the train to clear same; that it looked to him like when the motorcycle lunged forward that Burch was trying to turn it to the left; that Burch stopped five or ten seconds before the accident occurred; that he couldn't see Burch's feet so he didn't know what he was doing with them.

Robert Dixon testified, in substance: That he lived in Beaumont, was 27 years old, worked for the Magnolia Refining Company, was acquainted with Mr. Burch, had been acquainted with him since 1930, and was with him on the night of the accident; he also was riding a motorcycle. That when they left the Pep Cafe, Burch was first, then Tucker and he was last, they being strung out in that order about fifteen feet apart; that he saw Tucker stop and looked up to see why he was stopping and saw he was stopping for the train. That at that time he was crossing the switch track although he had not left the switch track, but was in that neighborhood; that when he looked up he saw the train; that he then stopped; that he stopped by the side of a car close to the front fender of the car, and his best recollection was that there were two automobiles waiting on the crossing, and that he stopped by the rear car; that Tucker had stopped over on the right side of these automobiles; that Tucker had stopped in front of him about fifty or sixty feet from him; that he came to a complete stop; that from where he was he couldn't tell exactly how close Burch was to the train, and that he stayed there about twelve seconds, not a very long time; that he looked away, and when he looked back he saw the motorcycle falling; that when Burch first stopped, the train was moving by him all the time. He reiterated that Burch stopped about twelve seconds before the accident occurred.

The witness Perry Tucker admitted having made in writing, soon after the accident, the following statement, which he testified was true: "I was about even with the headlights on the auto on its left and Bob was maybe half a motor length ahead of me. I was standing with both feet on the ground. Tom (Burch) was standing with both feet on the ground, with his clutch thrown out and his motor was in low gear. His motor was cold and he was warming it up, racing his motor, and the vibration of the motor threw his clutch in and the motorcycle jumped ahead. He throwed it to the right and the head end of a boxcar struck the motorcycle at the front fender and the headlight and the motorcycle fell over to the right and he fell clear of the motor. His foot went under the wheel of the car that hit the motorcycle. Bob and I ran to him and picked him up and we carried him over to the sidewalk. I suppose the ambulance was there in five minutes and I went with Tom to Beaumont. The whole cause was the clutch vibrating into gear." Mr. Tucker gave the following additional testimony: In answer to the question whether he saw the plaintiff (Burch) sitting with both feet on the ground, he said that was correct, and that in his opinion Tom was sitting there with both feet on the ground, racing his motor, and that this jarred it into gear; that Burch had what is known as a suicide clutch, which is one that will sometimes stay out of gear and sometimes will not; that, in his opinion, was the way the accident happened, that he (Burch) was sitting there with his foot on the ground, that he was racing his motor, that it went into gear and went forward. On cross examination, he testified that he did not actually see the motorcycle run into the train, but he heard the noise and looked up and the plaintiff was under the train.

E. L. Williford testified in substance that he lived in Silsbee; that he was a commissioned peace officer of Hardin County, Texas, and had been for nearly four years. That at the time of the accident he was sitting in an automobile parked in front of Pope's Cafe, in Silsbee. (This is the cafe which is located on the west side of the highway and immediately north of the railroad right-of-way.) He testified his car was parked about at right angle to Pope's Cafe, and according to his recollection was the last car parked next to the railroad track; that according to his recollection the train covered the crossing after they had parked in front of the cafe. That it was a freight train moving west; that while sitting there a motorcycle drove up on the right-of-way and stopped between automobiles that were waiting for the train to clear; that the man on it sat

there for a second, raced the motor of his motorcycle and looked back over his shoulder, and then looked forward, and that about that time the machine started forward and he turned it to the left and struck the train; that when the motorcycle first stopped it was in the clear of the train; that the driver had one foot on the ground; that he was positive that the motorcycle was in the clear; that he did not notice the other two motorcycles. That after the accident he jumped out of his car and went to the train; when he got there two or three people had hold of the boy and carried him over to a post near Pope's Cafe and he, the witness, asked them to carry him over near the cafe and on the concrete. He described the crossing as asphalt and in his opinion it was smooth, and that he had crossed it many times and had had no difficulty in doing so. That he did not remember any loose sand or gravel being on the crossing to any extent. That he went over the crossing a number of times and did not·remember any chugholes or anything of that kind; that the crossing was like any other crossing.

Dr. Ernest Robertson, who treated appellee, testified that appellee told him how he received his injury; that he was perfectly conscious when he made the statement; that appellee said there were three or four of them riding motorcycles in a caravan coming toward Beaumont on the edge of the town of Silsbee; that a freight train was over the crossing; that they stopped five or ten feet from the train, waiting until the train passed; that for some unknown reason to him his motorcycle went into gear and plunged him into the train. Dr. J. M. Gardner, another surgeon who treated appellee, testified that appellee made a statement to him as to how the accident occurred. That appellee said he stopped for a train. That he was riding a motorcycle and he had stopped. That in some way or other something started the motorcycle after he had stopped, and he ran under the train. That appellee was entirely conscious when he made that statement; he was not talking at random.

█ It is clear beyond all reasonable doubt that appellee saw the train at least a distance of sixty feet ahead of him, and that he could have stopped his motorcycle at a safe distance from the train. His friends riding with him on motorcycles stopped their machines at a safe distance. It is also clear beyond a reasonable doubt,

that appellee·had sixty feet in which to change the course of his motorcycle and to avoid striking the train. On these points, we find no conflict in the testimony. It is also clear beyond a reasonable doubt, though the point is denied by appellee, that he stopped his motorcycle a short distance from the train, and by racing his motor, caused it to lunge forward into and against the freight car, thereby causing the collision. Every eyewitness except appellee testified to these facts. On the undisputed evidence, appellee was not in the exercise of ordinary care as he drove the sixty feet from the switch track to the train. The following authorities clearly sustain this construction of the testimony: Texas & N. O. R. R. Co. v. Stratton, Tex.Civ.App., 74 S.W.2d 741; Texas & N. O. R. R. Co. v. Compton, 135 Tex. 7, 136 S.W.2d 1113; San Antonio & A. P. R. Co. v. Singletary, Tex. Civ.App., 251 S.W. 325; Gulf, C. & S. F. R. Co. v. Gaddis, Tex.Com.App., 208 S.W. 895; Koock v. Goodnight, Tex.Civ.App., 71 S.W.2d 927; Texas & N. O. R. R. Co. v. Beard, Tex.Civ.App., 91 S.W.2d 1080.

█ The evidence in this case has been fully developed. Our order is therefore that the judgment of the lower court be reversed and judgment be here rendered in favor of appellant.

Reversed and rendered.